UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| HOWARD T. BALDWIN, individually and on behalf of all others similarly situated,<br><br>                            Plaintiffs,<br><br>             v.<br><br>STAR SCIENTIFIC INC., ROCK CREEK PHARMACEUTICALS, INC., and GNC HOLDINGS, INC.,<br><br>                          Defendants. | No.<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   JURISDICTION AND VENUE ...........................................................................3

III.  PARTIES ................................................................................................................3

IV.   FACTS ....................................................................................................................4

      A.    Star Scientific Launched Anatabloc to Treat Diseases Without any Clinical Evidence Supporting Its Claims................................................................4

      B.    Star Scientific Teams Up with GNC to Lend Credibility to a Worthless Product ..5

      C.    Star Scientific Released False Results for Anatabloc Based on Testing Conducted by a Star Scientific Investor....................................................10

      D.    Star Scientific Bribed the Now-Indicted Former Virginia Governor and His Wife to Promote Anatabloc From the Governor's Mansion.......................11

      E.    Star Scientific Falsely Promoted Johns Hopkins as Being Involved in Studying Anatabloc ..................................................................................12

            1.    The Animal Study ...............................................................13

            2.    The Human Study ...............................................................15

      F.    The FDA Sent Star Scientific a Warning Letter Dated December 20, 2013, Because Star Scientific Should Have Submitted Anatabloc to the FDA for Approval as a New Drug Prior to Being Sold...................................20

      G.    Defendants' Conduct Injured Plaintiff and the Class ...........................22

V.    CLASS ACTION ALLEGATIONS ....................................................................22

VI.   CAUSES OF ACTION ........................................................................................25

COUNT I  VIOLATION OF STATE CONSUMER PROTECTION ACTS VIOLATION OF STATE CONSUMER PROTECTION LAWS................................................25

COUNT II  BREACH OF EXPRESS WARRANTIES .....................................................29

COUNT III  BREACH OF IMPLIED WARRANTIES .....................................................33

COUNT IV  UNJUST ENRICHMENT .............................................................................36

PRAYER FOR RELIEF ..........................................................................................37

JURY DEMAND ..................................................................................................38

010423-11  669526 V1

Plaintiff Howard T. Baldwin ("Plaintiff"), through his undersigned counsel, based on personal knowledge as to the facts related to him and based on the investigation of counsel for all other allegations, complains of Defendants Star Scientific, Inc. ("Star Scientific"), Rock Creek Pharmaceuticals, Inc. ("Rock Creek"), and GNC Holdings, Inc. ("GNC") (collectively, "Defendants") alleges as follows:

## I.     INTRODUCTION

1.     Defendants manufacture, market and/or sell Anatabloc, a dietary supplement purportedly derived from an anatabine alkaloid found in tobacco, tomatoes, potatoes, and eggplant. Defendants promote Anatabloc as a "wonder drug" with a number of medical benefits and uses, from treating excessive inflammation (associated with arthritis) to Alzheimer's disease, traumatic brain injury (or concussions), diabetes and multiple sclerosis.

2.     The problem, however, is that Defendants have never proven any of these substantial claims in clinical trials or received U.S. Food and Drug Administration ("FDA") approval for its products. Moreover, Anatabloc is not the "wonder drug" it claims to be.

3.     The Federal Trade Commission publicly recognizes that:

Health fraudsters often target people who are overweight, have serious conditions like cancer, or conditions without a cure, like:

- multiple sclerosis

- diabetes

- Alzheimer's disease

- HIV/AIDS

- arthritis.[1]

---

[1] http://www.consumer.ftc.gov/articles/0167-miracle-health-claims (last accessed January 26, 2014).

- 1 -

Defendants' marketing claims for Anatabloc hit four out of the five most common "conditions without a cure" targeted by "health fraudsters" from the FTC's list.

4.      With respect to concussions, the FDA's National Health Fraud Coordinator has warned: "[W]e can promise you this: There is no dietary supplement that has been shown to prevent or treat [concussions]."[2] Similarly, the director of the FDA's Division of Dietary Supplement Programs has stated: "As amazing as the marketing claims here are, the science doesn't support the use of any dietary supplements for the prevention of concussions or the reduction of post-concussion symptoms that would enable one to return to playing a sport faster."[3]

5.      Knowing the wonder drug was too good to be true, Star Scientific and Rock Creek (collectively, "Star Scientific") launched a marketing ploy in which they conveyed the false and misleading impression that Johns Hopkins University School of Medicine ("Johns Hopkins") was officially and independently sponsoring and carrying out studies of Anatabloc in order to give scientific credibility to the claims about the products' miraculous medical benefits and uses. In fact, however, Star Scientific had hired Drs. Paul Ladenson ("Ladenson") and Patrizio Caturegli ("Caturegli"), who worked at Johns Hopkins, as paid consultants. Johns Hopkins had no role in the studies whatsoever.

6.      Defendants charged the exorbitant price of approximately $99 per bottle of Anatabloc – despite the fact that the "wonder drug" cannot treat or cure arthritis, Alzheimer's disease, traumatic brain injury (or concussions), diabetes or multiple sclerosis. As a result of Defendants' misrepresentations, Plaintiff and the Class have suffered out-of-pocket losses, did

---

[2] http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm378845.htm.

[3] http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm378845.htm.

not receive the benefit of the bargain, and have been damaged. Plaintiff and the Class should receive a full refund of their purchase price.

## II.    JURISDICTION AND VENUE

7.    This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the Class is a citizen of a State different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual Class members in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2) and (6). Plaintiff is a citizen of Illinois, whereas Defendants are citizens of Virginia, Pennsylvania, and Massachusetts for the purposes of diversity. Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A). Furthermore, Plaintiff alleges that more than two-thirds of all of the members of the proposed Class in the aggregate are citizens of a state other than Virginia, Pennsylvania, or Massachusetts, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

8.    Venue is appropriate in this District because Defendants reside here and/or do business within this District.

## III.    PARTIES

9.    Plaintiff Howard T. Baldwin, is a citizen of Oak Brook, Illinois. Mr. Baldwin purchased Anatabloc both from a GNC store located in Yorktown, Illinois and on-line directly from Rock Creek on a subscription basis during the Class Period. He purchased Anatabloc

because he saw and was deceived by Defendants' advertisements. He cancelled his subscription because Anatabloc did not work. Plaintiff was damaged as the result of Defendants' wrongdoing.

10.     Defendant Star Scientific is a Delaware corporation with its corporate headquarters located in Glen Allen, Virginia. Star Scientific claims to be a specialty pharmaceutical company engaged in the development, manufacture, and marketing of bio-equivalent pharmaceutical products in addition to the development of branded products.

11.     Defendant Rock Creek is a Delaware corporation with offices in Gloucester, Massachusetts, and is a wholly-owned subsidiary of Star Scientific. Defendant Rock Creek currently manufactures and sells two nutraceutical dietary supplements.

12.     Defendant GNC Holdings, Inc. is a Delaware corporation located in Pittsburgh, Pennsylvania, and describes itself as a leading global specialty retailer of health and wellness products.

## IV.     FACTS

### A.     Star Scientific Launched Anatabloc to Treat Diseases Without any Clinical Evidence Supporting Its Claims

13.     After striking out in the cigarette and smokeless tobacco businesses in the 1990s, Star Scientific reinvented itself as a company that produces nutritional supplements and cosmetic products. In 2007, Star Scientific established subsidiary Rock Creek to focus on the development, manufacture, sale, and marketing of so-called "nutraceutical" dietary supplements and cosmetic products derived from certain alkaloids found in the Solanaceae family of plants, which includes potatoes, tomatoes, and eggplants. Nutraceuticals are foods or food-derived products meant to provide health benefits. Unlike pharmaceutical drugs, nutraceuticals are not subject to rigorous clinical testing requirements and regulations, and therefore can be brought to market quickly and easily, without formal regulatory approval.

- 4 -

14.     The first purported dietary supplement developed by Star Scientific was CigRx, which was developed in 2009 to temporarily reduce the urge to smoke. Since being introduced into the market in August 2010, CigRx has been a complete flop, recording only "de minimis" sales, according to Star Scientific's SEC filings.

15.     As a result, Star Scientific desperately needed to hit a "home run" with its next product offering in order to keep the Company afloat. Its next product was RCP-006 (later sold under the brand name Anatabloc), which is a compound that combines vitamins A and D3 with an anatabine alkaloid found in the tobacco plant. Defendants billed Anatabloc as a miracle supplement, with a variety of medical benefits and uses, ranging from inhibiting inflammation to treating a number of ailments, including Alzheimer's disease, traumatic brain injury, ulcers, diabetes, and multiple sclerosis.

16.     Desperate to bring in revenue after posting negligible sales (only $418,000) for the first half of 2011, Star Scientific launched the Anatabloc dietary supplement in August 2011 – even though it had yet to achieve any clinical results showing Anatabloc was effective.

**B.      Star Scientific Teams Up with GNC to Lend Credibility to a Worthless Product**

17.     As disclosed in Star Scientific's 2011 Annual Report, to win over skeptical investors and consumers, Star Scientific focused nearly all of its marketing efforts on the sale of its Anatabloc dietary supplement and face cream, which it later introduced as an antidote for wrinkles.

18.     The Anatabloc dietary supplement was first available on-line in August 2011 through Star Scientific-sponsored sites. The Anatabloc label promises that Anatabloc provides "Anti-Inflammatory Support":





19.     In fact, as reflected below, Defendants marketed Anatabloc for the treatment of a whole host of diseases, including inflammation such as that associated with arthritis, even though Anatabloc cannot, in fact, treat those diseases.

20.     Anatabloc was first offered to GNC customers on February 1, 2012, when the retailer began selling the product through GNC.com and in select stores. After sales of Anatabloc showed impressive growth in-store, GNC placed Anatabloc in all of its U.S.-owned retail

- 6 -

locations.[4] As of May 23, 2013, Anatabloc was available at all of GNC's corporate stores, which included approximately 2,922 locations in all fifty states, as well as the District of Columbia and Puerto Rico.

21.     In support of Anatabloc, on June 1, 2012, GNC began using an advertisement poster of professional golfer and Anatabloc Brand Ambassador, Fred Couples, prominently displayed on the front window of every GNC corporate store. Well-known to suffer from arthritis,[5] Couples is a 32-year veteran of the PGA Tour, with over 50 professional tournament wins, including the Masters (1992).  In addition, he has been twice named the PGA Tour Player of the Year (1991, 1992).[6] One version of the poster follows:

---

[4] http://stage.investorroom.com/starscientific/2012-05-23-Anatabloc-Retail-Expansion-with-GNC-Complete-Product-Now-Available-at-all-GNC-Corporate-Stores-and-GNC-com,1 (last accessed January 27, 2014).

[5] http://singularityhub.com/2012/04/24/regenokine-the-unproven-treatment-that-professional-athletes-are-flying-to-germany-for/(last accessed January 27, 2014).

[6] http://stage.investorroom.com/starscientific/2012-05-23-Anatabloc-Retail-Expansion-with-GNC-Complete-Product-Now-Available-at-all-GNC-Corporate-Stores-and-GNC-com,1(last accessed January 27, 2014).

- 7 -



22.     Star Scientific touted its partnership with GNC, stating: "GNC continues to be a valuable partner for Anatabloc® because of its reputation in the area of nutritional supplementation and its loyal customer base. We are very much looking forward to an ongoing relationship with GNC as we continue to expand the marketing and distribution of Anatabloc®."[7]

23.     GNC also pushed Anatabloc by naming Anatabloc its "Wellness Winner" in the category of "Best Product Innovation" for 2012. GNC announced the awards via GNC's social media, press releases and at the 2013 Arnold Sports Festival in Columbus, Ohio, in February. For example, Star Scientific promoted the fact that Anatabloc was promoted on GNC's homepage:

---

[7] http://stage.investorroom.com/starscientific/2012-05-23-Anatabloc-Retail-Expansion-with-GNC-Complete-Product-Now-Available-at-all-GNC-Corporate-Stores-and-GNC-com,1 (last accessed January 27, 2014).

 **Anatabloc**
Good Morning world! Want to see something pretty cool? Go to www.GNC.com and check out the rotating banner on the homepage. Wait for it.......

**GNC: Vitamins, Supplements, Minerals, Herbs, Sports Nutrition, Diet & Energy and more.**
www.gnc.com
Shop GNC for vitamins, supplements, minerals, herbs, sports nutrition, diet and energy, and health and beauty products at gnc.com

Like · Comment · Share · 👍 18 💬 2 · 5 hours ago · 

24.     GNC gave Anatabloc its "gold seal" award:



25.     Star Scientific's Vice President of Sales and Marketing stated in a press release: "We could not ask for a better partner than GNC. The growth of Anatabloc® and increase in awareness of the product over the past year could not have happened without the support of GNC. We are honored to have been chosen for this award."

26.     Consumers who shop at GNC rely on GNC's superior knowledge in dietary supplements, as well as its commitment to truth in marketing. For example, the GNC Code of Business Ethics provides:

> We have set the standard in the health and nutrition industry by demanding truth in labeling and ingredient safety and potency, while remaining on the cutting edge of nutritional science. We are the world's largest company of its kind, devoted exclusively to

- 9 -

helping our customers improve their quality of life through better nutrition and healthier living.

From our scientific research and new product discovery to our manufacturing and packaging processes and finally our interaction with customers in our stores, everything GNC does is done with rigorous quality.

27.     Yet, GNC touted Anatabloc without any evidence that Anatabloc could in fact provide a benefit to consumers. In fact, Anatabloc could not provide the benefits touted by GNC or Star Scientific.

**C.     Star Scientific Released False Results for Anatabloc Based on Testing Conducted by a Star Scientific Investor**

28.     Prior to launching Anatabloc, Rock Creek teamed up with the Roskamp Institute to conduct research on Anatabloc. In an April 7, 2010 press release, Star Scientific announced that it had entered into a research and royalty agreement with an affiliate of the Roskamp Institute, SRQ BIO, LLC (collectively with the Roskamp Institute, "Roskamp") to conduct research on Anatabloc for a variety of neurological conditions, including Alzheimer's disease. Under the agreement, Roskamp would receive royalties in the amount of 5% of Anatabloc sales and 100,000 shares of Company stock (valued at $272,000). In addition, Roskamp founder and trustee Robert Roskamp became a significant investor in Star Scientific.

29.     Throughout 2011 and 2012, Star Scientific and Roskamp conducted and reported on a few clinical and preclinical trials designed to assess the effect of Anatabloc on inflammation and other ailments. While Star Scientific publicly reported that the results of these studies were positive, it failed to disclose any data supporting the supposedly positive results. In one study, called the "Flint Study," Roskamp tested the effect of Anatabloc on individuals with chronic inflammation. Two days apart, Star Scientific announced wildly different results, first claiming

- 10 -

26% of the subjects experienced a positive effect and then claiming it was 61%. This significant discrepancy called into question the results of the study and all others performed by Roskamp.

**D.    Star Scientific Bribed the Now-Indicted Former Virginia Governor and His Wife to Promote Anatabloc From the Governor's Mansion**

30.    Ahead of its launch of the product, Star Scientific embarked on a national promotional tour, in which Star Scientific bribed its CEO's political friends to promote the unproven Anatabloc. The first stop was a June 1, 2011, conference at Roskamp, which was attended by scientists and institutional investors alike. At the conference, Star Scientific's CEO introduced the First Lady of Virginia, Virginia Governor Robert McDonnell's wife, Maureen. In her speech, Mrs. McDonnell expressed her full support for Anatabloc, stating that the product could be used to lower health care costs in Virginia and around the country, and in a grand, pre-staged gesture, publicly offered the Executive Mansion to host the upcoming launch party. According to one investor who attended the event, her speech "wowed attendees." Over the next several months, Mrs. McDonnell attended numerous events in which she publicly endorsed Anatabloc.

31.    Star Scientific capitalized on the positive press generated from the First Lady of Virginia's public endorsement by holding the launch party at the Virginia Governor's Executive Mansion, which was announced in a Company press release dated August 30, 2011. The Governor and his wife hosted and attended the event and their presence gave Anatabloc credibility. According to John Clore, a professor at the Virginia Commonwealth University School of Medicine, who attended the event, "It was an event that was designed to make a big splash.... That was the week it was showing up in stores."

32.    Star Scientific used its connections to the McDonnells and the First Lady's public endorsement of the product to gain access to top state officials to promote this product. Star

- 11 -

Scientific's CEO met with the Virginia Health Secretary and a top official from Virginia Department of Health and Human Resources where they discussed how Anatabloc could be used to lower health costs among state employees. In an April 1, 2013, article from The Washington Post, the Virginia Attorney General stated "I think with any Virginia product, it's helpful to have support from the governor. In any state, it is helpful to have a governor's support."

33. On January 21, 2014, the former Virginia Governor was indicted for accepting lavish bribes from Star Scientific in return for the promotion of Anatabloc. Among other gifts, Star Scientific: (i) had donated nearly $80,000 worth of air travel to Governor McDonnell for his 2009 gubernatorial campaign and during his recent term in office; (ii) provided nearly $10,000 worth of food, lodging, transportation, and entertainment from the Company and defendant Williams in 2011 and 2012; (iii) paid for nearly $15,000 in catering costs for the June 2011 wedding of the McDonnells' daughter and another $10,000 to help pay the expenses of their other daughter's wedding in 2013; (iv) flew Mrs. McDonnell to New York in the spring of 2011 and treated her to an expensive shopping spree consisting of $15,000 worth of clothes; (v) used Star Scientific's corporate jet to fly Mrs. McDonnell around to each of the stops on Star Scientific's national promotional tour; and (vi) bought a $6,500 Rolex watch for Mrs. McDonnell to give to the Governor.

**E.    Star Scientific Falsely Promoted Johns Hopkins as Being Involved in Studying Anatabloc**

34. Although Star Scientific had already enlisted the financially interested Roskamp to perform research, it needed the imprimatur of an independent, elite academic institution to give scientific credibility to the significant claims being made about Anatabloc's potential medical benefits and to generate excitement among consumers. Star Scientific understood that, because of its sterling reputation within the medical and scientific communities and among the

public, Johns Hopkins' association with the testing of an unproven product like Anatabloc would give it instant scientific credibility. After all, Johns Hopkins is consistently ranked as one of the top medical institutions in the United States. Star Scientific hired Dr. Ladenson, chief of the Johns Hopkins divisions of Endocrinology and Metabolism, and Dr. Caturegli, also a professor in the Pathology department of Johns Hopkins, to moonlight as paid consultants in connection with the clinical development and testing of Anatabloc. However, Star Scientific has not disclosed the financial terms of the arrangements.

### 1.     The Animal Study

35.     In 2011, Drs. Ladenson and Caturegli conducted the Animal Study to test the effect of anatabine on mice with thyroiditis, which is a disease marked by inflammation of the thyroid gland. Star Scientific and its affiliates provided crucial advice and financial support to the Animal Study by: (i) providing the anatabine used in the study; and (ii) allowing the same Roskamp researchers who were conducting trials for Star Scientific to provide key guidance and advice to the researchers.

36.     In an April 29, 2011 *Seeking Alpha* article by investor Dr. John Faessel, he touted the promise of the drug based on Johns Hopkins' supposedly substantial involvement in clinical testing of it, stating in relevant part:

> A proprietary Star Scientific compound is now being tested on humans at … Johns Hopkins University School of Medicine …. Because of the astonishing success of the Star Scientific compound in encouraging new neuronal cell growth and reducing B-amyloid at the cellular level, Johns Hopkins University – a major research institution – is phasing in new uses of the compound in several other disease venues: cancers, thyroid, arthritis, and other diseases … research at the Johns Hopkins suggests that a low grade inflammation in pregnant women can pass through the placenta and blood-brain-barrier and cause aberrant neuronal growth within the fetal brain that could lead to autism and other disorders of presumed neurodevelopment origin, like schizophrenia and cerebral palsy …. Now we see that Mr. Sharp is

- 13 -

a new board member of Star Scientific (March 17, 2011). Let it be said again: Star Scientific makes the product the Roskamp Institute uses for its Alzheimer studies …. Mr. Sharp is a member of the Johns Hopkins Medicine Board of Advisors, so he must have been aware of the Johns Hopkins involvement with the testing of Star's anatabine/RCP006 compound.

37.     Except for the fact that Drs. Ladenson and Caturegli were employed as professors by Johns Hopkins during this time, the university did not have any official involvement in the Animal Study, as reflected by the later published January 23, 2013, article by *The Street* entitled, "Star Scientific's Made-up, Misleading Relationship with Johns Hopkins," which stated that "Johns Hopkins has no official involvement with Star Scientific or anatabine."

38.     Nevertheless, Star Scientific perpetuated the deception that Johns Hopkins was officially and independently involved in clinical testing of Anatabloc. Moreover, Star Scientific reported the results of the Animal Study as wholly positive, describing them as "impressive" based on the researchers' supposed findings that anatabine lowered the incidence and severity of thyroiditis.

39.     The paid consultants also whole-heartedly endorsed Anatabloc at every stop on Star Scientific's promotional tour of Anatabloc, alongside the First Lady of Virginia, during the summer and fall of 2011. Drs. Ladenson and Caturegli expressed high praise for Anatabloc despite not even knowing either how the supplement worked or its effect on humans. At a scientific conference held in Newport Beach, California, on October 27, 2011, while presenting his findings, Dr. Ladenson was asked a pointed question asking the mechanism of the action. In response, he admitted that "they didn't know yet."

40.     At each of these medical and investor conferences, Drs. Ladenson and Caturegli also gave the misleading impression to investors and doctors they had conducted these studies on behalf of Johns Hopkins. For example, at the June 1, 2011, conference attended by myriad

- 14 -

leading scientists and investors, one attendee described their presentation in a published report

entitled, "Dr. Faessel – Report from the Roskamp Meeting in Sarasota, Florida" dated June 2,

2011, stating:

> Two prominent Johns Hopkins University researchers also
> presented, renowned endocrinologist Dr. Paul Ladenson and
> internationally known Dr. Patrizio Caturegli. They seemed like
> they were about ready to jump thru their very reserved demeanor
> when they spoke to their research on Anatabine in thyroiditis etc.
> Johns Hopkins is doing research using anatabine/ (RCP-006) on
> gastroenterology, rheumatology, cancer, auto immune diseases
> (lupus), cardio atherogenesis (the developmental process of
> atheromatous plagues in arteries) and other conditions too.
>
> Significantly, Dr. Ladenson added that there was no known
> compound that stops thyroiditis except anatabine (RCP-006).
>
> I was told that Dr. Ladenson used the term, astonishing when he
> spoke recently about (RCP-006). Supposedly, his wife says that
> astonishing is a word he doesn't use.

41.    Rather than set the record straight, Star Scientific perpetuated this false

relationship by putting out a number of press releases starting in the fall of 2011, timed to

coincide with the introduction of Anatabloc into the market, and continuing into 2012, touting

the positive results of the tests performed by, as Star Scientific referred to them, "the

independently funded research team at Johns Hopkins."

### 2.    The Human Study

42.    In 2012, Star Scientific initiated a major trial designed to investigate the effects of

a nutritional supplement containing Anatabloc on humans with thyroiditis. In what it billed to be

a follow-up study to the earlier Animal Study, Star Scientific retained Drs. Ladenson and

Caturegli as lead consultants on the Human Study, but again failed to disclose that Johns

Hopkins was not involved.

- 15 -

43.     In a number of press releases, Star Scientific reported that this latest study was a natural extension of the previous one and closely linked the two studies together, misrepresenting that Johns Hopkins was officially involved in the Human Study.

44.     Based on this misleading information, analysts viewed the release of the results of the Human Study as the key milestone for Star Scientific because if positive, they would bring instant scientific credibility to an unproven product. For example, in an August 1, 2012 report, one analyst stated that "the most important short-term announcement ... will be the release from [Johns] Hopkins of its test findings of the effectiveness of Star [Scientific's] Technology upon Thyroid Diseases" and that "It is our opinion that release of the [Johns] Hopkins' test results using Star [Scientific's] Anatabloc technology for treatment of thyroid diseases will be particularly important to [Star Scientific] performance near term."

45.     The reason consumers placed so much importance on the results of this Human Study was that the Johns Hopkins' name carries significant weight within the scientific and medical communities. After all, although the Company had touted Anatabloc as being a potential treatment for a number of diseases, these claims had not been verified by the FDA or in human clinical trials. For example, according to a *Washington Post* article dated April 1, 2013, entitled, "McDonnell Traded Favors with Dietary Supplements Maker Now Under Investigation" the director of medical and scientific operations at the Alzheimer's Association, Heather M. Snyder, stated that "there really is not data to support [Anatabloc as a potential treatment for Alzheimer's disease] at this time." In addition, according to a *Richmond Times-Dispatch* article dated July 21, 2013, entitled "Anatomy of Anatabloc," David Schardt, a senior nutritionist for the Center for Science in the Public Interest, a nonprofit health advocacy group, noted that without valid clinical trial results, Anatabloc's "long-term health effects for people we[re] unclear," and that

- 16 -

"[i]n this respect, Anatabloc is like a lot of other dietary supplements that make explicit or implicit claims that exceed the scientific evidence."

46. Accordingly, while Roskamp was also performing testing on Anatabloc, the attention of analysts was almost entirely focused on the anticipated results of the Human Study. For example, in an August 2, 2013 report, one analyst repeatedly pointed to the prestige of the Johns Hopkins name in explaining the reasons why the Human Study was so important, stating in part:

> (a) "Flint is not exactly a household name. Johns Hopkins is recognized worldwide" and power and prestige of the name Johns Hopkins are significant;
>
> (b) "If the [Johns] Hopkins study results are positive," that could potentially influence doctors worldwide, as "we anticipate a great many doctors will follow the Hopkins-Ladenson lead and recommend their thyroid patients use Anatabloc"; and
>
> (c) "We estimate [potential] revenue in 2013 of $400 million of revenue and $1.00 per share of earnings [which] is computed solely from that which we believe Star [Scientific] might be able to achieve from the Johns Hopkins impact on U.S. Anatabloc results."

47. On January 7, 2013, Star Scientific announced preliminary results of the Human Study, which it claimed to show, without providing any supporting data, that Anatabloc lessens inflammation in patients with thyroiditis. Star Scientific included a quote from Dr. Ladenson in the press release, in which he claimed that the interim results from the study were positive. Nowhere in this press release or any public statement does the Company disclose that it was paying Dr. Ladenson to consult on the study and provide this purportedly independent assessment.

48. On January 23, 2013, *The Street* published an article entitled Star Scientific's Made-Up, Misleading Relationship With Johns Hopkins," which disclosed that Star Scientific

- 17 -

misrepresented Johns Hopkins' involvement in the clinical testing of Star Scientific's nutritional

supplement anatabine. More specifically, the article revealed that Johns Hopkins had not

sponsored or been officially involved with either the Animal Study or Human Study and

disclosed for the first time that Drs. Caturegli and Ladenson were acting as paid consultants for

Star Scientific in connection with the clinical development and testing of Anatabloc. The article

stated in part:

> Manti Te'o isn't alone in concocting imaginary relationships. So, too, is Star Scientific, which has misled investors about the involvement of Johns Hopkins University in the clinical testing of the company's retail nutritional supplement anatabine.
>
> Star Scientific and its Internet stock promoters want investors to believe that Johns Hopkins has been actively involved with, and even supportive of anatabine's clinical development. The benefit to Star Scientific is obvious: Johns Hopkins is well-known and respected, so the school's academic imprimatur lends scientific credibility to anatabine.
>
> Except Johns Hopkins has no official involvement with Star Scientific or anatabine. That includes Star's subsidiary Rock Creek Pharmaceuticals, according to a Johns Hopkins School of Medicine spokesperson.
>
> "The Anatabloc Supplementation Autoimmune Prevention [ASAP] clinical study was not conducted at or approved by Johns Hopkins," Johns Hopkins' Stephanie Desmon said via email.
>
> Star reported initial interim results from the ASAP study of anatabine as a potential treatment for thyroid disease on Jan. 7. The company claims the study succeeded but failed to disclose any real data. Star's press release included a promotional quote about anatabine from Dr. Paul Ladenson, described as a "senior endocrinological consultant" for the study.
>
> Ladeneson's[sic] real job is director of the Division of Endocrinology and Metabolism at Johns Hopkins School of Medicine. He's a thyroid disease expert. Why did Star Scientific omit Ladenson's academic affiliation from its Jan. 7 press release? Likely because as Desmon made clear, Ladenson's role in Star Scientific's anatabine thyroid disease study had nothing to do with Johns Hopkins.

- 18 -

Star Scientific paid Ladenson for his consulting work, which apparently includes offering this assessment of the anatabine thyroid study:

> Data from this rigorously conducted, placebo-controlled, double blind trial show that anatabine-treated subjects had progressive decreases in circulating thyroglobulin antibody levels, which became significant by the end of the trial. Current treatment for autoimmune thyroiditis is limited to end-stage disease when irreversible gland damage necessitates lifelong thyroid hormone replacement. The prospect of a novel nutritional or pharmaceutical intervention that could preserve thyroid health represents an encouraging advance. Further clinical studies are now warranted.

Asked to comment on whether Johns Hopkins, as Ladenson's employer, approved his anatabine statement, Desmon responded:

> "We do have guidelines about such things and he [Ladenson] is in violation here." Johns Hopkins has started an inquiry into the matter, Desmon added.

Johns Hopkins would not make Ladenson available to comment. Star Scientific did not respond to an email requesting comment.

Dr. Patrizio Caturegli, also a professor at Johns Hopkins Medical School and a paid consultant to Star Scientific, co-authored a paper last year with Ladenson in which mice were treated with anatabine. Star Scientific publicizes the findings of Caturegli's paper without disclosing the company's financial relationship with the authors.

As it stands, there is no science backing Star's claims that anatabine reduces inflammation, relieves pain or treats Alzheimer's, thyroid disease, multiple sclerosis, traumatic brain injury or other auto-immune diseases [These are all medical claims Star makes or insinuates with its constant anatabine promotions.]

Anatabine is not FDA approved for anything, but thanks to lax rules and generous loopholes, Star is able to sell the nutritional supplement over the Internet and at GNC retail outlets. What Star hasn't been able to do is convince people to buy anatabine. Sales are minimal, totaling just $1.7 million in the last reported quarter.

Which is where the Johns Hopkins connection comes into play. Star wants investors and the general public to believe anatabine is a drug capable of curing all sorts of diseases. The marketing

- 19 -

message is simple: If Johns Hopkins believes in anatabine, you should too.

Internet stock promoter Dr. John Faessel (he's a dentist) embraces Star's misleading marketing message and runs with it. In two columns posted recently on Seeking Alpha -both bullish on Star Scientific -Faessel refers repeatedly to the "successful Rock Creek/Johns Hopkins human trials of anatabine."

Wrong. Johns Hopkins had no involvement in the anatabine trial.

Gilford Securities analyst Otis Bradley also plays along with the deception. In a recent research note, Bradley writes, "The [anatabine] thyroid research has been done by the Johns Hopkins University School of Medicine, certainly one of the most preeminent medical institutions in the world, under the lead of Paul Ladenson, chief endocrinologist and one of the preeminent leaders in the world in his profession."

Wrong again. Star Scientific is solely in charge of the anatabine thyroid study, which recruited patients from nine private U.S. clinics, none with academic credentials. Ladenson may be an expert on thyroid disease but he's being paid by Star Scientific.

Star Scientific also pays golfer Fred Couples to endorse anatabine. At this point, there's very little to distinguish Couple's advertising pitch and Ladenson's consulting work.

**F.    The FDA Sent Star Scientific a Warning Letter Dated December 20, 2013, Because Star Scientific Should Have Submitted Anatabloc to the FDA for Approval as a New Drug Prior to Being Sold**

49.    Drug companies must apply to the FDA for approval to sell a new drug.

50.    Since Anatabloc is promoted "for use in the cure, mitigation, treatment, or prevention of disease," it is considered a drug under section 201(g)(1)(B) of the Federal Food, Drug and Cosmetic Act. 21 U.S.C. § 321(g)(1)(B). Thus, the FDA must be convinced of the safety and efficacy of these products before they can be marketed to humans. 21 U.S.C. § 321(g).

51.    Despite this requirement, Defendants have promoted, advertised and marketed Anatabloc without seeking or receiving FDA approval. In fact, they could not have obtained

- 20 -

FDA approval because the supposed studies they completed would not meet the FDA's requirements for scientific support.

52.     Even though Defendants marketed Anatabloc for over-the-counter use, the representations made by Defendants concerning the treatment of serious diseases, such as Alzheimer's or diabetes, were deceptive and misleading because any products touting Anatabloc's effects from a medical standpoint require physician supervision.

53.     On December 20, 2013, the FDA sent Star Scientific a Warning Letter. The FDA stated that Star Scientific "promotes the product Anatabloc for conditions that cause the product to be a drug under section 201(g)(1)(B) of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 321(g)(1)(B)]. The therapeutic claims on these websites establish that this product is a drug because it is intended for use in the cure, mitigation, treatment, or prevention of disease."[8]

54.     The FDA further stated: "[y]our product Anatabloc is not generally recognized as safe and effective for the above referenced [disease treatments] and, therefore, this product is a 'new drug' under section 201(p) of the Act [21 U.S.C. § 321(p)]. New drugs may not be legally introduced or delivered for introduction into interstate commerce without prior approval from the FDA, as described in section 505(a) of the Act [21 U.S.C. § 355(a)]; see also section 301(d) of the Act [21 U.S.C. § 331(d)]. FDA approves a new drug on the basis of scientific data submitted by a drug sponsor to demonstrate that the drug is safe and effective."[9]

---

[8] http://www.fda.gov/iceci/enforcementactions/warningletters/2013/ucm379639.htm (last accessed January 27, 2014).

[9] http://www.fda.gov/iceci/enforcementactions/warningletters/2013/ucm379639.htm (last accessed January 27, 2014).

**G.    Defendants' Conduct Injured Plaintiff and the Class**

55.    The Anatabloc dietary supplement was originally sold in bottles of 200 tablets, and later in bottles of 300 tablets when dosing instructions were changed based on a consumer's weight, for $99.99. Star Scientific reported in November 2013 that its revenues were based "almost exclusively" on the sale of Anatabloc.

56.    Plaintiffs and the Class purchased Anatabloc based on Defendants' misrepresentations that Anatabloc would provide a benefit. Because Anatabloc cannot provide a benefit, Plaintiffs and the Class were injured, suffering economic injuries, and are entitled to a full refund for their purchases.

## V.    CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and a Class defined as follows:

> All persons who paid, in whole or in part, for Anatabloc dietary supplement between August 1, 2011 and the present for personal, family or household uses.

Excluded from the Class are Defendants, any entity in which Defendant has a controlling interest, and Defendants' legal representatives, predecessors, successors, assigns, and employees. If necessary, Plaintiff also brings this action pursuant to Rule 23(b)(3) on behalf of a GNC Subclass defined as:

> All persons who paid, in whole or in part, for Anatabloc dietary supplement purchased from GNC between August 1, 2011 and the present for personal, family or household uses.

The Class and GNC Subclass will hereinafter be referred to collectively as the "Class."

58.    The definition of the Class is unambiguous. Plaintiff is a member of the Class he seeks to represent. The Class members can be notified of the class action through publication and direct mailings to address lists maintained in the usual course of business by Defendants.

- 22 -

59.     The Class members are so numerous that their individual joinder is impracticable. The precise number of Class members is unknown at this time but, based on Defendants' reported sales figures, it is clear that the number greatly exceeds the number to make joinder possible.

60.     Common questions of law and fact predominate over the questions affecting only individual Class members. Some of the common legal and factual questions include:

   a.     Whether Defendants' conduct as set forth herein constitutes the act, use or employment of an unconscionable commercial practice, deceptive, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission of any material fact;

   b.     Whether Defendants violated state consumer protection statutes and/or false advertising statutes and/or state deceptive business practices statutes;

   c.     Whether Defendants breached express or implied warranties;

   d.     Whether Defendants violated the common law of unjust enrichment; and

   e.     The nature and extent of damages and other remedies to which the conduct of Defendants entitles the Class members.

61.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the Class members. Similar or identical statutory and common law violations and deceptive business practices are involved. Individual questions, if any, pale by comparison to the numerous common questions that predominate.

62.     The injuries sustained by Plaintiff and the Class members flow, in each instance, from a common nucleus of operative facts – Defendants' misconduct. In each case Defendants marketed and sold Anatabloc by misleading and deceiving Plaintiff and the Class members that

Anatabloc had been proven to be effective for its marketed purposes. Plaintiff and the Class members have been damaged by Defendants' misconduct. Plaintiff and the Class members have paid a significant price for Anatabloc, a product which would not have been legally sold or purchased in the absence of Defendants' marketing campaigns and deceptive scheme.

63.     Plaintiff's claims are typical of the claims belonging to absent Class members. Plaintiff paid for and ingested Anatabloc, which Defendants manufactured, marketed, and sold based on the promise that Anatabloc could and would provide a benefit.

64.     Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is familiar with the basic facts that form the bases of the Class members' claims. Plaintiff's interests do not conflict with the interests of the other Class members that he seeks to represent. Plaintiff has retained counsel competent and experienced in Class action litigation, who intend to prosecute this action vigorously. Plaintiff's counsel have successfully prosecuted many complex Class actions, including consumer protection Class actions. Plaintiff and his counsel will fairly and adequately protect the interests of the Class members.

65.     The class action device is superior to other available means for the fair and efficient adjudication of the claims belonging to Plaintiff and the Class members. The relief sought for each individual Class member is small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by the conduct of Defendants. Furthermore, it would be virtually impossible for the Class members to seek redress on an individual basis. Even if the Class members themselves could afford such individual litigation, the court system could not.

66.     Individual litigation of the legal and factual issues raised by the conduct of Defendants would increase delay and expense to all parties and to the court system. The class

- 24 -

action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court. Given the similar nature of the Class members' claims and the absence of material differences in the state statutes and common laws upon which the Class members' claims are based, a nationwide Class will be easily managed by the Court and the parties.

## VI.  CAUSES OF ACTION

### COUNT I

### VIOLATION OF STATE CONSUMER PROTECTION ACTS
### VIOLATION OF STATE CONSUMER PROTECTION LAWS

67.  The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiff on behalf of himself and members of the Class.

68.  Plaintiff and the members of the Class are individuals that paid for purchases of the Anatabloc dietary supplement for personal, family, or household purposes.

69.  Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the promotion and sale of Anatabloc.

70.  Defendants violated this duty by misrepresenting the characteristics, uses, benefits, quality, and intended purposes of Anatabloc.

71.  Plaintiff and members of the Class were directly and proximately injured by Defendants' conduct and would not have paid for Anatabloc had Defendants not engaged in their deceptive marketing campaign.

72.  Defendants' deceptive representations and material omissions to Plaintiff and the proposed Class members were, and are unfair and deceptive acts and practices.

73.  Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiff and the proposed Class members.

- 25 -

74.     As a proximate result of Defendants' misrepresentations and omissions, Plaintiff and the proposed Class members have suffered an ascertainable loss and are entitled to relief, in an amount to be determined at trial.

75.     Defendants' actions, as complained of herein, constitute unfair compensation or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of various state consumer protection statutes listed below.

76.     Specifically, Plaintiff alleges and the Class seeks redress under the following statutes, which allow corporations to bring consumer protection claims:

    a.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALASKA STAT. § 45.50.471, *et seq.*;

    b.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. § 44-1522, *et seq.*;

    c.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE § 48-88-101, *et seq.*, including § 4-88-113(f), and § 4-88-102(5);

    d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CAL. BUS. & PROF. CODE § 17200, and CAL. CIV. CODE § 1770, *et seq.* At this time Plaintiff seeks injunctive relief only on this claim. A letter pursuant to CAL. CIV. CODE § 1782 was sent to Defendants, and Plaintiff will amend if needed to seek damages;

    e.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of COLO. REV. STAT. § 6-1-105, *et seq.*, including § 6-1-113(1)(c) and § 6-1-102(b);

    f.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, *et seq.*, including § 42-110(a)(3);

    g.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 DEL. CODE § 2511, *et seq.*, including 6 DEL. CODE § 2512;

    h.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE § 28-3901, *et seq.*, including § 28-390(1);

- 26 -

i.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. § 501.201, *et seq.*;

j.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, *et seq.*, including § 48-602;

k.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of INDIANA CODE ANN. § 24-5-0.5-3;

l.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 501/1, *et seq.*;

m.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ME. REV. STAT. ANN. Tit. § 59205-A;

n.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CONN. LAW CODE § 13-101, *et seq.*, including § 13-101(h);

o.      Plaintiff will assert, after the period for the present demand letter has passed, that Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Ch. 93A § 1, *et seq.*;

p.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. STAT. § 445.901, *et seq.*, including § 445-902(c);

q.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MINN. STAT. § 325F.67, *et seq.*, including § 407.010(5);

r.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's MO. REV. STAT. § 407.010, *et seq.*;

s.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. § 59-1601, *et seq.*, including § 59-1601(1);

t.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. § 598.0903, *et seq.*;

u.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. § 358-A:1, *et seq.*, including § 358A:1(1);

v.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. STAT. ANN. § 57:8-1, *et seq.*, including § 56:8-1(d);

w.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. § 57-12-1, *et seq.*;

x.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, *et seq.*;

y.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1, *et seq.*;

z.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, *et seq.*, including § 51-15-01(4);

aa.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OHIO REV. STAT. § 1345.01, *et seq.*, including § 1345.01(B);

bb.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OKLA. STAT. Tit. 15 § 751, *et seq.*;

cc.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*, including § 646.605(4);

dd.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. STAT. § 201-1, *et seq.*, including § 201-2(2);

ee.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE LAWS § 39-5-10, *et seq.*, including § 39-5-10(9);

ff.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODE LAWS § 37-24-1, *et seq.*, including § 37-24-1(8);

gg.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WEST VA. CODE § 46A-6-101, *et seq.*;

hh.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN. § 40-12-101, *et seq.*;

ii.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of UTAH CODE ANN. § 13-1 1-1, *et seq.*;

010423-11 669526 V1

jj.     Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of WASH. REV. CODE § 19.86.010, *et seq.*, including § 19.86.010(1); and

kk.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT. § 100.18, *et seq.*

77.     Plaintiff and members of the Class were injured by Defendants' conduct because Plaintiff and members of the Class would not have paid for Anatabloc, absent Defendants' conduct. Plaintiff and Class members are entitled to damages, restitution, disgorgement, and/or such orders or judgments as may be necessary to restore to any person in interest, any money which may have been acquired by means of such unfair practices and to the relief set forth below.

78.     Plaintiff has provided notice to the Attorney General where required by state statute and has sent pre-suit demand letters where appropriate.

## COUNT II

## BREACH OF EXPRESS WARRANTIES

79.     Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

80.     Defendants are in the business of selling Anatabloc and other supplements to consumers such as Plaintiff and the members of the Class, including, but not limited to, supplements of the kind sold to Plaintiff and the members of the Class.

81.     Plaintiff and the members of the Class purchased Anatabloc.

82.     Defendants expressly warranted that Anatabloc could treat or cure a variety of ailments and diseases.

010423-11 669526 V1

83. Anatabloc does not conform to these express representations because it cannot treat or cure the variety of ailments or diseases touted by Defendants. Thus, Defendants breached their express warranties.

84. As a direct and proximate result of the breach of said warranties, Plaintiffs and the Class members suffered and/or will continue to be harmed and suffer economic loss.

85. Plaintiffs and the Class members did rely on the express warranties of the Defendants herein.

86. Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue.

87. Defendants' conduct breached their express warranties in violation of, among other state express warranty laws:

      a.      ALA. CODE. § 7-2-313;

      b.      AK. ST. § 42.02.313;

      c.      ARIZ. REV. STAT. ANN. § 47-2313;

      d.      ARK. CODE ANN. § 4-2-313;

      e.      CAL. COMM. CODE § 2313;

      f.      COLO. REV. STAT. § 4-2-313;

      g.      CONN. GEN. STAT. ANN. § 42A-2-313;

      h.      6 DEL. C. § 2-313;

      i.      D.C. STAT. § 28:2-313;

      j.      FLA. STAT. § 672.313;

      k.      GA. CODE. ANN. § 11-2-313;

      l.      HAW. REV. STAT. § 490:2-313;

m.      IDAHO CODE ANN. § 28-2-313;

n.      810 ILL. COMP. STAT. 5/2-313;

o.      IND. CODE § 26-1-2-313;

p.      IOWA CODE § 554.2313;

q.      KANSAS STAT. ANN. § 84-2-313;

r.      KY. REV. STAT. ANN. § 355.2-313;

s.      LA. CIV. CODE. ANN. ART. 2520;

t.      11 MAINE REV. STAT. ANN. § 2-313;

u.      MD. COM. LAW CODE ANN. § 2-313;

v.      MASS. GEN. LAWS ANN. 106 § 2-313;

w.      MICH. COMP. LAWS ANN. § 440.2313;

x.      MINN. STAT. ANN. § 336.2-313;

y.      MISS. CODE ANN. § 75-2-313;

z.      MISSOURI REV. STAT. § 400.2-313;

aa.     MONT. CODE. ANN. § 30-2-313;

bb.     NEB. REV. STAT. § 2-313;

cc.     NEV. REV. STAT. § 104.2313;

dd.     N.H. REV. STAT. § 382-A:2-313;

ee.     N.J. STAT. ANN. § 12A:2-313;

ff.     N.M. STAT. ANN. § 55-2-313;

gg.     N.Y. U.C.C. LAW § 2-313;

hh.     N.C. GEN. STAT. ANN. § 25-2-313;

ii.     N.D. STAT. § 41-02-30;

jj.   OHIO REV. CODE ANN. § 1302.26;

kk.   OKLA. STAT. ANN. TIT. 12A, § 2-313;

ll.   OR. REV. STAT. § 72.3130;

mm.   PA. STAT. ANN. TIT. 13, § 2313;

nn.   R.I. STAT. § 6A-2-313;

oo.   S.C. § 36-2-313;

pp.   S.D. COD. LAWS § 57A-2-313;

qq.   TENN. CODE. ANN. § 47-2-313;

rr.   TEX. BUS. & COM. CODE ANN. §2.313;

ss.   UT. CODE ANN. § 70A-2-313;

tt.   VT. STAT. ANN. § 2-313;

uu.   VA. CODE ANN. § 8.2-313;

vv.   WA. ANN. § 62A.2-313;

ww.   W. VA. CODE § 46-2-313;

xx.   WIS. STAT. § 402.313; and

yy.   WYO. STAT. § 34.1-2313.

88.   Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of themselves and members of the Class, placed Defendants on notice thereof.

89.   As a direct and proximate result of the foregoing acts and/or omissions, Plaintiffs and the Class members have suffered damages entitling them to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

## COUNT III

## BREACH OF IMPLIED WARRANTIES

90.     Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

91.     Defendants are in the business of selling Anatabloc to consumers such as Plaintiff and the members of the Class, including, but not limited to, dietary supplement products of the kind sold to Plaintiff and the members of the Class.

92.     Plaintiff and the members of the Class purchased Anatabloc.

93.     At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed Anatabloc.

94.     At the time Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed Anatabloc for use by Plaintiff and the Class members, Defendants knew of the use(s) for which Anatabloc was intended, and impliedly warranted the product to be of merchantable quality.

95.     Defendants' representations and warranties were false, misleading, and inaccurate, in that Anatabloc was not of merchantable quality because the product could not deliver on the advertised claims and the product was not approved by the FDA.

96.     Plaintiff and the Class members did rely on said implied warranty of merchantability.

97.     Plaintiff and the Class members reasonably relied upon the skill and judgment of Defendants as to whether Anatabloc was of merchantable quality.

98.     Anatabloc was injected into the stream of commerce by Defendants despite the fact that Anatabloc was expected to and did reach users, handlers, and persons coming into contact with the product without substantial change in the condition in which it was sold.

- 33 -

99.     Defendants breached the implied warranties, as Anatabloc was not fit for its intended purposes and uses as it could not deliver on the intended purposes and was not approved for such uses by the FDA.

100.     As a direct and proximate result of the breach of implied warranties, Plaintiff and the Class members suffered and/or will continue to be harmed and suffer economic loss.

101.     Defendants' conduct breached its implied warranties regarding its products under state implied warranty laws including:

    a.    ALA. CODE. § 7-2-314 and § 7-2-315;

    b.    ARIZ. REV. STAT. ANN. § 47-2314 and § 47-2315;

    c.    ARK. STAT. § 7-2-314 and § 7-2-315;

    d.    AK. ST. § 45.02.314 and § 45.02.315;

    e.    CAL. COMM. CODE § 2314 and § 2315;

    f.    CO. REV. STAT. § 4-2-314 and § 4-2-315;

    g.    CONN. GEN. STAT. § 41a-2-314 and § 41a-2-315;

    h.    6 DEL. C. § 2-314 and § 2-315;

    i.    D.C. STAT. § 28:2-314 and § 28:2-315;

    j.    FLA. STAT. § 672.314 and § 672.315;

    k.    GA. CODE. ANN. § 11-2-314 and § 11-2-315;

    l.    HAW. REV. STAT. § 490:2-314 and § 490:2-315;

    m.    IDAHO CODE ANN. § 28-2-314 and § 28-2-315;

    n.    810 ILL. COMP. STAT 5/2-314 and 5/2-315;

    o.    IND. CODE § 26-1-2-314 and § 26-1-2-315;

    p.    IOWA CODE § 554.2314 and § 554.2315;

q.      KAN. STAT. ANN. § 84-2-314 and § 84-2-315;

r.      KY. REV. STAT. ANN. § 355.2-314 and § 355.2-315;

s.      LA. CIV. CODE ANN. ART. 2524;

t.      MAINE REV. STAT. ANN. § 2-314 and § 2-315;

u.      MD. COM. LAW CODE ANN. § 2-314 and § 2-315;

v.      MASS. GEN. LAWS ANN. 106 § 2-314 and § 2-315;

w.      MICH. COMP. LAWS ANN. § 440.2314 and § 440.2315;

x.      MINN. STAT. ANN. § 336.2-314 and §336.2-315;

y.      MISS. CODE ANN. § 75-2-314 and § 75-2-315;

z.      MO. REV. STAT. § 400.2-314 and § 400.2-315;

aa.     MONT. CODE ANN. § 30-2-314 and § 30-2-315;

bb.     NEB. REV. STAT. § 2-314 and § 2-315;

cc.     NEV. REV. STAT. § 104.2314 and § 104.2315;

dd.     N.H. STAT. ANN. § 382-A:2-314 and § 382-A:2-315;

ee.     N.J. STAT. ANN. § 12A:2-314 and § 12A:2-315;

ff.     N.M. STAT. ANN. § 55-2-314 and § 55-2-315;

gg.     N.Y. U.C.C. § 2-314 and § 2-315;

hh.     N.C. GEN. STAT. § 25-2-314 and § 25-2-315;

ii.     N.D. STAT. § 41-02-31 and § 41-02-32;

jj.     OHIO REV. CODE ANN. § 1302.27 and § 1302.28;

kk.     OKLA. STAT. ANN. TIT. 12A, § 2-314 and § 2-315;

ll.     O.R.S. § 72.8020 and § 72.8030;

mm.     PA. STAT. ANN. TIT. 13, § 2314 and §2315;

nn.  R.I. GEN. LAWS § 6A-2-314 and § 6A-2-315;

oo.  S.C. § 36-2-314 and § 36-2-315;

pp.  S.D. COD. LAWS. § 57A-2-314 and § 57A-2-315;

qq.  TENN. CODE. ANN. § 47-2-314 and § 47-2-315;

rr.  TEX. BUS. & COM. CODE ANN. § 2.314 and § 2.315;

ss.  UT. CODE ANN. § 70A-2-314 and § 70A-2-315;

tt.  VT. STAT. ANN. TIT. 9A, § 314 and § 315;

uu.  VA. CODE ANN. § 8.2-314 and § 8.2-315;

vv.  WASH. REV. CODE § 62A.2-314 and § 62A.2-315;

ww.  W. VA. CODE § 46-2-314 and § 46-2-315;

xx.  WIS. STAT. § 402.314 and § 402.314; and

yy.  WYO. STAT. § 34.1-2-314 and § 34.1-2-315.

102.  Within a reasonable time after they knew or should have known of such breach, Plaintiff, on behalf of himself and members of the Class, placed Defendants on notice thereof.

103.  As a direct and proximate result of the foregoing acts and/or omissions, Plaintiff and the Class members have suffered damages, and are entitled to compensatory damages, punitive damages, costs and reasonable attorneys' fees.

**COUNT IV**

**UNJUST ENRICHMENT**

104.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein, and further allege as follows.

105.  At all relevant times, Defendants designed, manufactured, produced, marketed and/or sold Anatabloc.

010423-11 669526 V1

106.     Defendants have benefitted from their unlawful acts by receiving payments for the sales of Anatabloc.  Defendants knew that Anatabloc could not treat or cure diseases – but advertised that it did.

107.     Plaintiff and the Class members conferred non-gratuitous benefits upon Defendants by paying for Anatabloc.

108.     Defendants appreciated, or had knowledge of the non-gratuitous benefits conferred upon them by Plaintiff and the Class members.

109.     Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiff and the Class members, with full knowledge that, as a result of Defendants' unconscionable wrongdoing, Plaintiff and the Class members were not receiving products of the high quality, nature, fitness, or value as reasonable consumers expected.  Allowing Defendants to retain the non-gratuitous benefits Plaintiff and the Class members conferred would be unjust and inequitable under these circumstances.

110.     Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiff and the Class members would be unjust and inequitable, Plaintiffs and the Class members are entitled to, and hereby seek disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits in a manner established by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class members request that the Court enter an order or judgment against Defendants including the following:

A.     Certification of the action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure; appointment of Plaintiff as the Class Representative and appointment of his counsel as Class Counsel;

B.     Damages in the amount of monies paid for Anatabloc;

- 37 -

C.      Actual damages, statutory damages, punitive or treble damages, and such other

relief as provided by the statutes cited herein;

D.      Pre-judgment and post-judgment interest on such monetary relief;

E.      Other appropriate injunctive relief;

F.      The costs of bringing this suit, including reasonable attorneys' fees; and

G.      All other relief to which Plaintiff and the Class members may be entitled at law or

in equity.

### JURY DEMAND

Plaintiff hereby demands trial by jury on his own behalf, and on behalf of the absent

Class members, on all issues and claims presented above.


Dated: January 27, 2014                 Respectfully Submitted,


                                        By:   /s/ Elizabeth A. Fegan
                                              Elizabeth A. Fegan
                                        Daniel J. Kurowski
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1144 W. Lake Street, Suite 400
                                        Oak Park, IL  60301
                                        Telephone:  (708) 628-4960
                                        Facsimile:  (708) 628-4950
                                        Email: beth@hbsslaw.com
                                               dank@hbsslaw.com

                                        Steve W. Berman
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1918 8th Ave.
                                        Seattle, WA 98101
                                        Telephone:  (206) 623-7292
                                        Facsimile:  (206) 623-0594
                                        Email: steve@hbsslaw.com

                                        *Attorneys for Plaintiff*

010423-11  669526 V1