**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HOWARD T. BALDWIN, individually and on behalf of all others similarly situated, | ) )<br>) | 
| Plaintiff, | ) ) ) |
| v. | ) No. 14 C 588 ) |
| STAR SCIENTIFIC, INC., ROCK CREEK PHARMACEUTICALS, INC., and GNC HOLDINGS, INC., | ) Judge Rebecca R. Pallmeyer ) ) ) |
| Defendants. | ) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Defendants Star Scientific, Inc. ("Star Scientific"), Rock Creek Pharmaceuticals, Inc. ("Rock Creek"), and GNC Holdings, Inc. ("GNC") manufacture and sell Anatabloc, a pharmaceutical product allegedly marketed as a treatment for a wide range of maladies, including arthritis, Alzheimer's disease, traumatic brain injury, diabetes, and multiple sclerosis. Plaintiff Howard T. Baldwin, an Illinois citizen, alleges he purchased Anatabloc after he "saw and was deceived by Defendants' advertisements" but quit buying the product because it "did not work."[1]  (Class Action Compl. [1], hereinafter "Compl.," ¶ 9.)  Baldwin filed this putative class action lawsuit against Defendants on behalf of himself and a proposed class that includes "all persons" who have purchased Anatabloc since it was first made available to consumers.  (*Id.* ¶¶ 18, 57.)  Plaintiff asserts claims for violations of consumer protection statutes in 36 states and the District of Columbia (Count I), breaches of express and implied warranties under the laws of all 50 states and the District of Columbia (Counts II and III), and claims of common law unjust enrichment.  (Count IV).  Plaintiff alleges that he and proposed class members suffered

---

[1]    Curiously, Plaintiff has not disclosed his reason for purchasing Anatabloc in the first instance, whether to treat a traumatic brain injury, Alzheimer's disease, multiple sclerosis, diabetes, or some other ailment.  Nor does he allege that he or any member of the proposed class suffered physical injuries as a result of taking the drug, or that he or any proposed class member deferred or postponed more effective treatments in reliance on Anatabloc.

economic injuries by purchasing Anatabloc and asks for various forms of relief. (*Id.* ¶ 56, Prayer for Relief B–G.) Plaintiff invokes the Class Action Fairness Act of 2005 ("CAFA") as the basis for this court's jurisdiction. (*Id.* ¶ 7.) He alleges that the total claims of more than 100 individual class members exceed $5,000,000 in the aggregate and that minimal diversity[2] exists between the parties. (Compl. ¶ 7); *see* 28 U.S.C. § 1332(d)(2)(A).

Defendants have moved to dismiss the complaint [25], arguing that Plaintiff lacks Article III standing to assert claims in states where he has not alleged he personally suffered an injury. Defendants also argue that Plaintiff's Illinois state law causes of action should be dismissed because Plaintiff has not pleaded his fraud claim with particularity and has otherwise failed to allege "plausible" claims for relief as required under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). As explained below, the court has serious reservations about Mr. Baldwin's standing to assert claims on behalf of unnamed, proposed class members under the laws of jurisdictions where he has not suffered an injury. At this stage, however, the court concludes only that Plaintiff has not pleaded fraud with "particularity" as required by Federal Rule of Civil Procedure 9(b) and has failed to set forth particularized facts sufficient to satisfy federal pleading requirements for his remaining Illinois state-law claims. For these reasons, the court grants Defendants' motion and dismisses the complaint without prejudice.

## BACKGROUND

For the purposes of this motion, the court presumes that the factual allegations in Plaintiff's complaint are true. Defendant Star Scientific develops, manufactures, and markets pharmaceutical products. (Compl. ¶ 10.) Defendant Rock Creek is a wholly-owned Star Scientific subsidiary that manufactures and sells two "nutraceutical" dietary supplements. (*Id.* ¶ 11.) Defendant GNC sells health and wellness products online and at its retail stores

---

[2]     Plaintiff is an Illinois citizen. (Compl. ¶ 9.) Star Scientific is incorporated in Delaware and has its corporate headquarters in Virginia. (*Id.* ¶ 10.) Rock Creek is incorporated in Delaware and has its corporate offices in Massachusetts. (*Id.* ¶ 11.) GNC is also incorporated in Delaware and has its principal place of business in Pennsylvania. (*Id.* ¶ 12.)

throughout the world. (*Id.* ¶ 12.) Plaintiff alleges he purchased Anatabloc at a GNC store located in Yorktown, Illinois, and from Rock Creek through an online subscription service. (*Id.* ¶ 9.)

In 2007, Star Scientific created Rock Creek "to focus on the development, manufacture, sale, and marketing of so-called 'nutraceutical' dietary supplements and cosmetic products[.]" (Compl. ¶ 13.) "Nutraceuticals" are foods or products derived from foods that are intended to provide health benefits; Anatabloc is one such product. (*Id.* ¶ 15.) Plaintiff's complaint includes a photo of an Anatabloc package label touting the product as providing "Anti-Inflammatory Support" and as a "Dietary Supplement." (*Id.* ¶ 18.) In fact, Plaintiff alleges, Defendants represented that the product could do much more than what the label suggested, and that "Defendants billed Anatabloc as a miracle supplement, with a variety of medical benefits and uses, ranging from inhibiting inflammation to treating a number of ailments, including Alzheimer's disease, traumatic brain injury, ulcers, diabetes, and multiple sclerosis," despite the fact that "Anatabloc cannot, in fact, treat those diseases." (Compl. ¶¶ 15, 19; *see also id.* ¶¶ 1, 6, 52.) Star Scientific "launched" Anatabloc in August 2011, initially selling it online through "Star Scientific-sponsored sites." (*Id.* ¶¶ 16, 18.) GNC began selling the product online and in "select stores" in February 2012, eventually expanding to distribute Anatabloc at all of its retail and corporate stores throughout the country, as well as in Puerto Rico. (*Id.* ¶ 20.) Anatabloc is sold in bottles of 300 tablets for $99.99. (Compl. ¶ 55.)

Plaintiff alleges that Defendants engaged in a variety of improper strategies to sell Anatabloc. For example, Plaintiff asserts, Star Scientific gave cash and gifts to Virginia's former governor and his spouse in exchange for their support of Anatabloc. (*Id.* ¶¶ 30–33.) Star Scientific also allegedly claimed that Johns Hopkins University was "officially and independently involved in clinical testing of Anatabloc" when the University in fact had no such involvement. (*Id.* ¶ 38.) In reality, Plaintiff alleges, the University's only connection to the product was an arrangement in which Star Scientific hired two Johns Hopkins doctors "to moonlight as paid

consultants in connection with the clinical development and testing of Anatabloc." (*Id.* ¶ 34.) These two doctors, Plaintiff maintains, "whole-heartedly endorsed" Anatabloc prior to its release, even though they did not know how the product worked or its effects on humans. (Compl. ¶ 39; *see also id.* ¶¶ 38, 47.) In various press releases, Plaintiff asserts, Star Scientific referred to the paid doctors as "the independently funded research team at Johns Hopkins." (*Id.* ¶ 41.) Plaintiff further alleges that Rock Creek "teamed up" with a research institute to study Anatabloc's effects; that the institute received royalty payments from Anatabloc and other forms of remuneration; and that the institute's founder became a "significant investor" in Star Scientific. (*Id.* ¶¶ 28–29.)

According to Plaintiff, GNC "pushed Anatabloc by naming Anatabloc its 'Wellness Winner' in the category of 'Best Product Innovation' for 2012," which GNC announced in various press releases and at a sports festival in February 2013. (Compl. ¶ 23.) Included in Plaintiff's complaint is a photograph of a poster that GNC allegedly created to market the drug. (*Id.* ¶ 21.) The poster depicts Fred Couples, a well-known professional golfer, and quotes him endorsing Anatabloc. (*Id.* ¶ 21.) Star Scientific's relationship with GNC was itself a source of pride: Plaintiff alleges that Star Scientific cited its partnership with GNC as a reason for increased sales of Anatabloc. (*Id.* ¶¶ 23–25.) In its "Code of Business Ethics," GNC "demand[s] truth in labeling and ingredient safety and potency," and assures the public that GNC conducts "scientific research and new product discovery . . . with rigorous quality." (Compl. ¶ 26.) Plaintiff alleges that contrary to these standards, GNC promoted Anatabloc "without any evidence that Anatabloc could in fact provide a benefit to consumers," and that the product does not in fact provide any of the benefits of which Star Scientific and GNC boasted. (*Id.* ¶ 27.)

Plaintiff alleges that the Federal Drug Administration ("FDA") sent Star Scientific a warning letter on December 20, 2013. (*Id.* ¶ 53.) The letter observed that Star Scientific "promotes the product Anatabloc for conditions that cause the product to be a drug under . . . the Federal Food, Drug, and Cosmetic Act" because Star Scientific's claims about the drug

establish that "it is intended for use in the cure, mitigation, treatment, or prevention of disease." (*Id.*) The FDA further instructed that the agency considered Anatabloc a "new drug," effectively prohibiting its sale in interstate commerce without FDA approval. (Compl. ¶ 54.)

Plaintiff alleges that he and putative class members purchased Anatabloc "based on Defendants' misrepresentations that Anatabloc would provide a benefit." (*Id.* ¶ 56.) Plaintiff defines the class as "[a]ll persons who paid, in whole or in part, for Anatabloc dietary supplement [sic] between August 1, 2011 and the present for personal, family or household uses" and excludes from the class Defendants, as well as "any entity in which Defendant has a controlling interest, and Defendants' legal representatives, predecessors, successors, assigns, and employees." (*Id.* ¶ 57.) Plaintiff also asserts a subclass defined as "[a]ll persons who paid, in whole or in part, for Anatabloc dietary supplement [sic] purchased from GNC between August 1, 2011 and the present for personal, family or household uses." (*Id.*) Plaintiff alleges that the definition of the class is "unambiguous" and that he is a member of the Class he seeks to represent. (*Id.* ¶ 58.) He further alleges that his complaint satisfies class requirements and that the suit should proceed as a class action. (*See* Compl. ¶¶ 59–66.)

Plaintiff asserts four causes of action. In Count I, on behalf of unnamed, proposed class members, Plaintiff alleges that Defendants violated the consumer protection laws of 36 different states and the District of Columbia. (*Id.* ¶¶ 67–78.) In Counts II and III, Plaintiff alleges breaches of express and implied warranties under the laws of all 50 states and the District of Columbia, again on behalf of unnamed, proposed class members. (*Id.* ¶¶ 79–87.) In Count IV, Plaintiff alleges unjust enrichment on behalf of himself and unnamed, proposed class members without identifying the common law or statutory provisions underlying this claim. (*See id.* ¶¶ 104–110.) Plaintiff asserts that he and the proposed class suffered "economic injuries" because of Defendants' actions and are entitled to full refunds for their purchases of Anatabloc as well as various other forms of relief. (Compl. ¶¶ 56, Prayer for Relief B–G.) Plaintiff does not say how many bottles he purchased individually (at the $99.99 for 300 tablet price), nor does he

otherwise document the extent of the economic injuries he or other members of the class suffered. Plaintiff also does not say whether he suffers from any of the ailments Anatabloc is allegedly marketed to treat, nor does he allege that he or any proposed class member suffered a physical injury as a result of taking the product.

## DISCUSSION

Defendants' motion to dismiss challenges Plaintiff's complaint on two grounds: First, Defendants contend that Plaintiff lacks standing to assert claims under the laws of any state other than Illinois. Second, Defendants argue that Plaintiff's allegations underlying his Illinois state-law claims are insufficient. The court addresses these arguments in turn.

### I.    Standing

"Standing is an essential component of Article III's case-or-controversy requirement." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To establish Article III standing, a plaintiff must show (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61; *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 756 (7th Cir. 2008). Plaintiff bears the burden to establish standing. *See Apex*, 572 F.3d at 443 (citing *Perry v. Village of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999)). When ruling on a Rule 12(b)(1) motion to dismiss for lack of standing, the court "accept[s] as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor." *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003) (citing *Retired Chicago Police Assoc. v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996)).

Defendants argue that Plaintiff "does not allege that he has suffered any injury in any jurisdiction other than Illinois, or that he has otherwise suffered an injury-in-fact in any state other than Illinois," and so he "lacks Article III standing to assert claims under the laws of any

jurisdiction other than Illinois."[3] (Def.'s Mem. in Supp. of Mot. to Dismiss Compl., herein "Def.'s Mot." [29], 3.) Plaintiff responds that this is a misstatement of the standard; because he has Article III standing to assert his *own* claims, Plaintiff contends, the court should reject Defendants' standing arguments, or alternatively, defer consideration of them until Rule 23 class certification proceedings. (Pl.'s Resp. to Def. Mot. to Dismiss, herein "Pl.'s Resp." [35], 7.)

At first blush, it seems apparent that Mr. Baldwin himself has no claims under the consumer protections laws of states where he did not purchase or use Anatabloc. Other class members do have such claims, he contends, so he asks the court to put the issue of his standing to one side and consider the matter down the road as part of its analysis of his adequacy as class representative and the typicality of his claims. He urges that such an approach is authorized by two Supreme Court cases in which the Court reviewed proposed settlement classes of persons exposed to asbestos. Although neither of these cases actually decided the standing issue, Plaintiff argues that they establish the propriety of deferring standing arguments until after class certification proceedings.

First, in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), the district court had certified a settlement class of asbestos victims, but the Supreme Court affirmed the Third Circuit's conclusion that Rule 23's class certification standards had not been satisfied. *Id.* at 620–24. Objectors to the proposed settlement challenged the class on both standing and Rule 23 grounds. *Amchem*, 521 U.S. at 612. Because a portion of the settlement class was comprised of people who had been exposed to asbestos but had yet to suffer "manifest injuries," the objectors contended these people could not show an injury-in-fact or redressability as required under Article III. *Id.* at 607, 612; *see Lujan*, 504 U.S. at 561. But the standing issues, the Court reasoned, "would not exist but for the class-action certification," so the Court chose to resolve the class certification issues first. *Amchem*, 521 U.S. at 612. That is, unless

---

[3] Defendants do not challenge Plaintiff's standing to sue under the laws of Illinois, where he alleges he personally suffered economic injuries. (Defs.' Reply to Pl.'s Resp. to Def.'s Mot. to Dismiss [38], 2.)

and until a class was certified, its unnamed, proposed class members were non-parties, meaning their standing was irrelevant. The class certification issues were, as the Court put it, "logically antecedent" to any standing issues. *Id.* And, because the Court concluded that the class failed to meet Rule 23's class certification standards, the Court did not address the objectors' standing arguments at all. *Id.* at 612–13.

Two years later, in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), the Court heard another asbestos-settlement case and assessed "the conditions for certifying a mandatory settlement class on a limited fund theory under Federal Rule of Civil Procedure 23(b)(1)(B)." *Id.* at 821.[4] As in *Amchem*, parties objected to the settlement on both standing and class certification grounds, arguing that certain members of the class had not suffered an "injury in fact" and therefore lacked standing. *Id.* at 831. On appeal from the lower courts' approval of the proposed settlement class, the Court first acknowledged that Article III concerns ordinarily must be addressed before deciding the merits of a case. The Court nevertheless again chose to consider the class certification issues before resolving standing challenges, reasoning as follows:

> Ordinarily, of course, this or any other Article III court must be sure of its own jurisdiction before getting to the merits. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 88–89 (1998). But the class certification issues are, as they were in *Amchem*, "logically antecedent" to Article III concerns, 521 U.S. at 612, and themselves pertain to statutory standing, which may properly be treated before Article III standing, *see Steel Co.*, *supra*, at 92. Thus the issue about Rule 23 certification should be treated first, "mindful that [the Rule's] requirements must be interpreted in keeping with Article III constraints. . . . " *Amchem*, *supra*, at 612–613.

---

[4]    A "limited fund theory" class action arises when there is a limited pool of funds from which "to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, pro rata distribution." *Ortiz*, 527 U.S. at 841. The limited-fund issue in the case arose after a defendant company, its insurers, and attorneys for asbestos plaintiffs' lawyers entered into an agreement that established a limit on the amount of funds to be made available to any settlement class. *Id.* at 825–26. Essentially, in *Ortiz*, the Court disagreed with the district court's use of the limited fund theory to certify a settlement class when the funds were limited only by virtue of an agreement among the parties. *Id.* at 848.

*Ortiz*, 527 U.S. at 831. Then in its analysis of the class certification ruling, the Court reversed the Fifth Circuit and rejected the use of a "limited fund theory" as a basis for class certification under Rule 23(b)(1)(B). *Id.* at 864. Again, because the class certification issues were dispositive, the Court did not address the standing arguments.

One might argue that *Ortiz* and *Anchem* authorize the court to bypass the standing issue only where class certification is being denied anyway; but the Seventh Circuit has not read the decisions so narrowly. In *Payton v. County of Kane,* 308 F.3d 673 (7th Cir. 2002), the Court of Appeals invoked *Ortiz* in acknowledging the propriety, in certain circumstances, of addressing class certification before Article III standing and treating the class as a whole as the relevant entity for standing purposes. In *Payton*, six named plaintiffs filed a class action against 19 Illinois counties that had charged arrestees a "bond fee" as a condition of their being released, a practice permitted by Illinois statute. Despite the fact that the named plaintiffs resided in just two of the 19 counties, the Court of Appeals concluded that the district court erred in refusing to consider "whether these named plaintiffs may represent a class that includes people from the other 17 named counties." 308 F.3d at 680. The question of class certification could precede an analysis of standing, the court observed, and then, "once a class is properly certified, statutory and Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs." *Id.* In ruling that a class action might well be appropriate, despite the apparent standing concerns, the court pointed out that the 17 other counties "are following a common [state] statute (and this common factor assures that the representative has the same legal claim as the unnamed parties . . . .)[.]" *Id.* at 681. The court concluded by emphasizing that the named plaintiff arrestees were not claiming standing to seek relief for an injury they did not share: "[t]hese putative representatives were personally injured *by the operation of the very same statute* that caused the injuries to all other members of the proposed class." *Id.* at 682 (emphasis added).

The case before this court differs in that Mr. Baldwin has brought claims under the statutes of dozens of other states. Whether the court may postpone the standing analysis until after class certification in these circumstances is a question that has divided the district courts. In *In re Magnesium Oxide Antitrust Litigation*, No. 10-cv-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011), certain plaintiffs who purchased products containing minerals manufactured by the defendants sued, alleging violations of various federal and state antitrust statutes and state consumer protection laws. *Id.* at *4. Defendant manufacturers challenged plaintiffs' standing to bring claims under the antitrust or consumer protection statutes of any state in which the plaintiffs had not purchased the defendants' products. *Id.* at *7, *25. The district court framed the issue as follows:

> It is well-settled that a named plaintiff in a class action is required to establish Article III standing. . . .
>
> Less well-settled is whether, pre-class certification, named plaintiffs are required to establish standing for each and every claim set forth in a class action complaint, or whether it is sufficient to establish standing for a single claim because a court will determine if the named plaintiffs have standing to represent the unnamed class members seeking redress under the balance of asserted claims during the class certification process pursuant to Federal Rules of Procedure 23.

*Id.* at *7–8 (internal citations omitted). The court ultimately concluded that the plaintiffs did not have standing in the states where they had not purchased the defendants' products because the court recognized no "exception to the rule that a plaintiff must demonstrate standing for each claim he seeks to press." *Id.* at *10 (citing *DaimlerChrysler v. Cuno*, 547 U.S. 332, 335 (2006)). If it were otherwise, the court reasoned, "a plaintiff would be able to bring a class action complaint under the laws of nearly every state in the Union without having to allege concrete, particularized injuries relating to those states, thereby dragging defendants into expensive nationwide class discovery, potentially without a good-faith basis." *Id.* at *10.

Some district courts read the Supreme Court's *Amchem* and *Ortiz* more broadly. *See, e.g.*, *In re Aftermarket Filters Antitrust Litig.*, 08-cv-4883, 2009 WL 3754041, at *5 (N.D. Ill. Nov.

5, 2009) (declining to dismiss antitrust claims under the laws of 28 states brought by a proposed nationwide class of purchasers of autofilters; "*Ortiz* created an exception, limited to class actions, to the general rule that courts address standing as a threshold matter."); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 579 (M.D. Pa. 2009) (refusing to dismiss antitrust claims under the laws of 25 states and the District of Columbia brought by a proposed class of chocolate candy purchasers; "Courts may evaluate class certification issues before Article III standing concerns if the former are 'logically antecedent' to the latter."). Under this interpretation, the named plaintiff is required to establish standing only for his individual claim and not for claims that he wishes to assert only on behalf of proposed class members. *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d 356, 377 (E.D.N.Y. 2010) (citation omitted) ("Whether the named plaintiffs have standing to bring suit under each of the state laws alleged is 'immaterial' because they are not bringing those claims on their own behalf, but are only seeking to represent other, similarly situated consumers in those states."). These courts conclude that the "relevant question . . . is not whether the Named Plaintiffs have standing [to pursue their individual claims]—they most certainly do—but whether their injuries are sufficiently similar to those of the purported Class to justify the prosecution of a nationwide class action." *In re Grand Theft Auto Video Game Consumer Litig. (No. II)*, 06-md-1739, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006); *see id.* (denying motion to dismiss claims under the consumer protection laws of states other than those where the named class representatives purchased video game manufactured by Defendants). In other words, these courts see defendants' standing arguments as attempts to use the "guise of standing" to raise issues more appropriately addressed at the class certification stage. *In re Bayer Corp.*, 701 F. Supp. 2d at 377. *See Kuhl v. Guitar Center Stores, Inc.*, No. 07-cv-0214, 2008 WL 656049, at *3 (N.D. Ill. March 5, 2008) (declining to dismiss fair pay claims brought under the laws of states other than Illinois, where proposed class representatives worked; "[i]t is only through a

determination of typicality of claims across the various state statutes that the court will know whether standing is appropriate for all the claims asserted.").

Other courts have disagreed with the above analysis, concluding that "the Supreme Court [in *Amchem* and *Ortiz*] did *not* intend for district courts to delay determining whether an actual case or controversy is before them." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 09-cv-3690, 2013 WL 4506000, at *6 (N.D. Ill. Aug. 23, 2013) (collecting cases). Instead, these courts "interpret *Ortiz* as requiring a court simultaneously facing both class certification and Article III standing to deal with Rule 23 issues first when they are dispositive, but not directing district courts to postpone an inquiry into the threshold issue of justiciability outside of that context." *Id. See also In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 923 (N.D. Ill. 2009), *vacated and remanded on other grounds sub. nom.*, *Minn-Chem, Inc. v. Agrium Inc.*, 657 F.3d 650 (7th Cir. 2011) (dismissing antitrust claims related to mineral price fixing asserted in jurisdictions where the named plaintiffs had not suffered an injury; the court concluded that *Ortiz* "does not compel a district court to delay reviewing Article III standing issues until after class certification" but instead requires an "appellate court simultaneously facing both class certification and Article III standing issues [to] deal with Rule 23 issues first when they are dispositive")

Some courts that are unwilling to defer resolving standing challenges also cite discovery cost concerns. For example, in *In re Wellbutrin XL Antitrust Litig.*, the court observed that permitting named plaintiffs to maintain claims of unnamed class members in jurisdictions where the named plaintiffs have not suffered injuries

> would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union. At the conclusion of that discovery, the plaintiffs would apply for class certification, proposing to represent the claims of parties whose injuries and modes of redress they would not share. That would present the precise problem that the limitations of standing seek to avoid. The Court will not indulge in the prolonged and expensive implications of the plaintiffs' position only to be faced with the same problem months down the road.

260 F.R.D. 143, 155 (E.D. Pa. 2009).

This court recognizes that there are credible arguments on both sides, but it appears that Defendants have the better of the issue in this context. The standing challenges in *Anchem* and *Ortiz* were directed toward members of a putative settlement class, not toward any particular named plaintiff. In both cases, the Supreme Court concluded that the class certification issues were "logically antecedent" to standing issues because if, as the Court concluded, the putative class was improperly certified, any standing challenge would be moot. *See Amchem*, 521 U.S. at 612; *Ortiz*, 527 U.S. at 831. In upholding a class action complaint in *Payton*, the Seventh Circuit permitted named plaintiffs to proceed on behalf of themselves and unnamed class members in other counties, but the named plaintiffs in *Payton* were challenging a bail fee practice authorized, in their home counties and several others, by a single state law: "These putative representatives were personally injured *by the operation of the very same statute* that caused the injuries to all other members of the proposed class." 308 F.3d at 682 (emphasis supplied).

In this case, Plaintiff has not suffered an injury in any state other than Illinois. It is undisputed that he has standing to bring claims for injury under Illinois law, but for the reasons explained below, the court concludes his allegations are insufficient to state such a claim. Because his allegations are ultimately insufficient to state a claim even under Illinois law, the court concludes it need not decide the issue of whether he has standing to proceed under other state statutes, on the assumption that somebody he seeks to represent would have such standing. Should he attempt to file an amended complaint, though, the court expects named representatives will include persons who have allegedly suffered injury under the laws of at least some, if not all, of the other states whose laws Plaintiff invokes here. *Cf. In re Target Corp. Data Sec. Breach Litig.*, ___ F.Supp.3d ___, (No. MDL 14-2522) 2014 WL 7192478, *3 (D.Minn., Dec. 18, 2014) (denying motion to dismiss state law claims in a nationwide action for

damages arising from consumer security breach, the court pointed out that "this is not a case where a single named plaintiff asserts the laws of a multitude of states in which that plaintiff does not reside. Rather, there are 114 named Plaintiffs who reside in every state in the union save four and the District of Columbia.")

## II.     Illinois Consumer Fraud and Deceptive Business Practices Act Violation (Count I)

Defendants urge that Plaintiff's allegations are insufficient to state a claim under Illinois law. Before addressing those arguments, the court pauses to note a concern about its jurisdiction, which Plaintiff asserts under the Class Action Fairness Act. Plaintiff does not allege how many Anatabloc bottles he himself purchased, which could provide insight into his personal economic damages (and potentially shed light on how many bottles a typical Illinois consumer purchased). Instead, he alleges only that he purchased unspecified quantities of Anatabloc both at a GNC store and on-line (Compl. ¶ 9), and that Anatabloc costs $99.99 per bottle. (*Id.* ¶ 55.) He further alleges that other members of the class purchased unspecified quantities of the drug. (*Id.* ¶ 56.) The court assumes that it has jurisdiction because Plaintiff's expectation (however realistic it may be) that he could litigate a nationwide class action against Defendants justified the conclusion that the class could recover economic damages in excess of CAFA's $5 million amount-in-controversy threshold. *Cf. Back Doctors Ltd. v. Metro. Prop. & Cas. Co., Inc.*, 637 F.3d 827, 830 (7th Cir. 2011) ("[T]he estimate of the dispute's stakes advanced by the proponent of federal jurisdiction controls unless a recovery that large is legally impossible."). Further, the court notes that there is complete diversity (not just minimal diversity as required by CAFA) in this case, and given Plaintiff's various requests for relief (e.g., injunctive relief, attorney's fees, economic damages (*see* Compl., Prayer for Relief B–G)), the $75,000 diversity jurisdiction threshold also appears to be satisfied.

Under Rule 12(b)(6), a party may seek dismissal of a complaint for "failure to state a claim upon which relief can be granted." In ruling on a 12(b)(6) motion, the court accepts as true all well-pleaded facts alleged in the complaint and draws all reasonable factual inferences

in favor of the non-moving party. *EEOC v. United Airlines, Inc.*, 693 F.3d 760, 761–62 (7th Cir. 2012). The court does not ask whether Plaintiff will ultimately prevail; rather, it asks whether he is entitled to offer evidence to support his allegations. *Smith v. Cash Store Mgmt., Inc.*, 195 F.3d 325, 327 (7th Cir. 1999).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A complaint need not contain "detailed factual allegations," *Twombly*, 550 U.S. at 555, but it must provide more than conclusory statements and "a formulaic recitation of a cause of action's elements, and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* Even post-*Twombly* and *Iqbal*, though, the federal pleading standard requires only that a plaintiff provide "'enough detail [in a complaint] to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.'" *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008)).

In Count I, Plaintiff alleges that Star Scientific, Rock Creek, and GNC violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). (Compl. ¶ 76, at l., citing 815 ILCS 501/1, *et seq.*) To state an ICFA claim, Plaintiff must allege "(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012) (quoting *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010)). In addition, because Plaintiff is a private party bringing an ICFA claim, he must prove "actual damages." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2012).

Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies when a federal plaintiff alleges fraud under the ICFA. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreens Co.*, 631 F.3d 436, 441 (7th Cir. 2011). Rule 9(b) requires a party who alleges fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Plaintiffs must state "'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Camasta*, 761 F.3d at 737 (quoting *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir.1992)). Put differently, Plaintiff's complaint "must describe the 'who, what, when, where, and how' of the fraud." *Pirelli Armstrong Tire Corp.*, 631 F.3d at 441–42 (citations omitted). In assessing the allegations under this standard, the court recognizes it is not to "take an overly rigid view of the formulation," and that ultimately, the level of specificity required to satisfy Rule 9(b) "may vary on the facts of a given case." *Id.*

Plaintiff's ICFA claim fails to satisfy Rule 9(b) for several reasons. For clarity's sake, the court discusses the complaint's deficiencies in separate sections below.

### A. Specific Alleged Misrepresentations Made by Individual Defendants

Plaintiff alleges that "Defendants" violated the ICFA by "misrepresenting the characteristics, uses, benefits, quality, and intended purposes of Anatabloc." (Compl. ¶ 70; *see also id.* ¶ 56 ("Plaintiff[] . . . purchased Anatabloc based on Defendants' misrepresentations that Anatabloc would provide a benefit.").) Plaintiff elsewhere alleges that "Defendants billed Anatabloc as a miracle supplement, with a variety of medical benefits and uses, ranging from inhibiting inflammation to treating a number of ailments, including Alzheimer's disease, traumatic brain injury, ulcers, diabetes, and multiple sclerosis . . . even though Anatabloc cannot, in fact, treat those diseases." (*Id.* ¶¶ 15, 19.)

The court agrees with Defendants that these allegations in Plaintiff's complaint are insufficient under Rule 9(b) because they do not allege *specific* misrepresentations made by

*individual* Defendants. Plaintiff's complaint is replete with allegations recounting vague, non-specific statements made by "Defendants" about Anatabloc's supposed benefits. But Plaintiff has not identified a single actual misrepresentation that was communicated to Plaintiff, much less which Defendant made it. *See Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 794–95 (7th Cir. 2004) (holding that a complaint satisfied Rule 9(b) because it identified the misrepresentations at issue, the specific dates on which they were made, and the specific persons responsible for making them). Further, Plaintiff cannot lump all Defendants together when pleading the misrepresentation element of his ICFA claim. He must produce *specific* misrepresentations made by *specific* Defendants, as "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 778 (7th Cir. 1994) (citation omitted). This is true regardless of whether Defendants made similar or even identical misrepresentations that were communicated to Plaintiff.

The complaint does contain a photograph that Plaintiff alleges reflects Anatabloc's packaging; the words on the packaging claim the drug provides "Anti-Inflammatory Support." (Compl. ¶ 18.) The complaint also includes one specific advertisement that Plaintiff alleges GNC "prominently displayed on the front window of every GNC corporate store." (*Id.* ¶ 21.) But there is no allegation that either advertisement contains the "miracle drug" language or promises that the drug can cure various diseases, misrepresentations that appear to form the basis of Plaintiff's ICFA claim. (*See, e.g.*, *id.* ¶¶ 1, 2, 5, 6, 15, 19, 52.) These advertisements, therefore, do not constitute a specific misrepresentation that satisfies Rule 9(b). Unless Plaintiff sets forth such particularized, Defendant-specific allegations concerning the nature of the alleged misrepresentations, his ICFA claim will not satisfy Rule 9(b)'s pleading strictures.

### B. Time and Place Where Plaintiff Saw Specific Alleged Misrepresentations

Plaintiff's complaint fails to satisfy Rule 9(b) for another reason: it does not specify when or where he saw the misrepresentations. Plaintiff alleges he purchased Anatabloc "because he

saw and was deceived by Defendants' advertisements," and that he bought the product both online and at a GNC store in Illinois. (Compl. ¶ 9.) This allegation fails to state with particularity when and where Plaintiff even purchased the product, much less where he saw the alleged misrepresentations, which is what Rule 9(b) requires. *See Dubicz*, 377 F.3d at 794 (upholding dismissal, on motion, of a complaint that did not allege specific dates when specific misrepresentations were made to a plaintiff). Neither does Plaintiff allege what misrepresentation induced him to purchase the drug. To satisfy Rule 9(b), Plaintiff must identify a specific misrepresentation that he saw, the date he saw it, and where he saw it. *See In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, MDL–1703, 2009 WL 937256, at *6 (N.D. Ill. Apr. 6, 2009) (dismissing complaint where "plaintiffs fail to allege that they saw any particular misrepresentation or the specific content of the misrepresentation," and where "plaintiffs also fail to adequately allege when they saw any misrepresentation"). The court would expect, further, that Plaintiff would be able to allege that he relied on those misrepresentations and expected Anatabloc to be effective in treating specific maladies.

**C.    Falsity**

Plaintiff's complaint also fails to satisfy Rule 9(b) because it does not plead with particularity how Defendants' alleged misrepresentations were false. Plaintiff asserts that "Defendants" misrepresented Anatabloc's efficacy by "promot[ing] Anatabloc as a 'wonder drug' with a number of medical benefits and uses" (Compl. ¶ 1), even though "Defendants have never proven any of these substantial claims in clinical trials or received [FDA] approval for its [sic] products." (*Id.* ¶ 2); (*see also id.* ¶ 16) ("Star Scientific launched the Anatabloc dietary supplement in August 2011—even though it had yet to achieve any clinical results showing Anatabloc was effective."); (*id.* ¶ 27) ("GNC touted Anatabloc without any evidence that Anatabloc could in fact provide a benefit to consumers.")

The problem for Plaintiff is that, even assuming the drug was not "effective," the complaint fails to produce a single allegation that attributes to a particular Defendant a

statement about Anatabloc's alleged effectiveness. The complaint contains no statement by any Defendant that says, for instance, that "clinical studies have shown that taking Anatabloc as recommended can cure Alzheimer's disease," or makes any similar assertion. The lack of such an allegation dooms Plaintiff's ability to show falsity, because "[l]ack of substantiation [for a defendant's representation] is deceptive only when the claim at issue implies there is substantiation for that claim[.]" *Gredell v. Wyeth Labs., Inc.*, 367 Ill. App. 3d 287, 291, 854 N.E.2d 752, 756 (1st Dist. 2006). In *Gredell*, the plaintiff brought ICFA claims against a manufacturer and a distributor of certain pharmaceutical products, alleging that the defendants deceptively marketed and sold the products as an effective treatment for common cold symptoms when the defendants had no scientific evidence to support the drug's reported effects. Ill. App. 3d at 288, 854 N.E.2d at 753. The appeals court rejected this argument as a matter of law, reasoning that the defendants were not *required* to cite scientific evidence that their drug worked; instead, the plaintiffs could show that defendants made a deceptive statement only if the defendants had said something like "tests show" their drug is effective at treating common cold symptoms. Ill. App. 3d at 291, 854 N.E.2d at 756. *Cf. id.* ("Merely because a fact is unsupported by clinical tests does not make it untrue."). Because the defendants never made statements to substantiate their claims that their drug worked, there was no deception.

As in *Gredell*, Plaintiff here does not allege a single instance where a Defendant said that Anatabloc was proven to treat or cure particular diseases or illnesses. In the absence of a single instance of substantiation, Plaintiff's citations to the FDA and Federal Trade Commission's admonitions that such diseases (e.g., Alzheimer's disease, arthritis, multiple sclerosis, diabetes) are currently incurable are immaterial. *Gredell*, 367 Ill. App. 3d at 291, 854 N.E.2d at 756; (*see* Pl.'s Resp. at 14; Compl. ¶¶ 2–3.) Plaintiff has therefore failed to adequately allege the "how" of the fraud. *See Pirelli Armstrong Tire Corp.*, 631 F.3d at 441–42

(citation omitted). For these reasons, the court dismisses Plaintiff's ICFA claim (Count I) against all Defendants without prejudice.

## III. Breach of Express Warranty (Count II)

 "To state a claim for breach of express warranty, plaintiffs must allege that (1) the seller made an affirmation of fact or promise; (2) relating to the goods; (3) which was part of the basis for the bargain; and (4) seller guaranteed that the goods would conform to the affirmation or promise." *Indus. Hard Chrome, Ltd. v. Hetran, Inc.*, 64 F. Supp. 2d 741, 747 (N.D. Ill. 1999) (applying Illinois law). And because an express warranty derives from contract law, "a party must have privity to the contract before bringing a breach of express warranty claim." *In re McDonald's French Fries Litig.*, 503 F. Supp. 2d 953, 957 (N.D. Ill. 2007) (applying Illinois law) (citation omitted). Further, in general, "a plaintiff must state the terms of the warranty or attach it to the complaint." *Northern Ins. Co. of N.Y. v. Silverton Marine Corp.*, No. 10-cv-0345, 2010 WL 2574225, at *6 (N.D. Ill. June 23, 2010) (applying Illinois law).

In Count II, Plaintiff alleges that Defendants "expressly warranted that Anatabloc could treat or cure a variety of ailments or diseases" (Compl. ¶ 82); that "Anatabloc does not conform to these express representations because it cannot treat or cure the variety of ailments or diseases touted by Defendants" (*id.* ¶ 83); and that Plaintiff relied on such warranties and suffered "economic loss" as a result. (*Id.* ¶¶ 84–85.) Elsewhere, Plaintiff pleads that "Defendants marketed Anatabloc for the treatment of a whole host of diseases, including inflammation such as that associated with arthritis, even though Anatabloc cannot, in fact, treat those diseases." (*Id.* ¶ 19.)

Plaintiff's express warranty allegations against Defendants do not satisfy federal pleading standards for several reasons. First, the allegations do not sufficiently set out the terms of a single specific "affirmation of fact or promise" that relates to Anatabloc. *Indus. Hard Chrome, Ltd.*, 64 F. Supp. 2d at 747. "Under an express warranty, the language of the warranty itself dictates the obligations of the parties." *Heisner ex rel. Heisner v. Genzyme Corp.*, No. 08-

cv-0593, 2008 WL 2940811, at *8 (N.D. Ill. July 25, 2008). Plaintiff pleads generally that "Defendants" at times "promoted," "warranted," "billed," "marketed," and "touted" Anatabloc as a drug that could treat or cure "a whole host of diseases," including Alzheimer's disease, traumatic brain injury, ulcers, diabetes, and multiple sclerosis. (*See* Compl. ¶¶ 1, 2, 6, 15, 19, 52, 83). But Plaintiff does not allege any factual statement that contains even the gist of the generalized allegation that the court cobbled together in the preceding sentence. Without such a statement, Plaintiff does not provide "fair notice" to Defendants of the grounds on which Plaintiff's claims against them rest. *See Reger Dev., LLC*, 592 F.3d at 764. While the court recognizes that the express warranty claim does not need to meet Rule 9(b)'s heightened pleading standard, even under Rule 8(a), this circuit has cautioned that "some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). The court concludes that Plaintiff's fuzzy, non-specific, alleged "statements" made by "Defendants" concerning Anatabloc's supposed benefits are too sketchy to support an express warranty claim against any Defendant.

Further, even if the court assumes Plaintiff's generalized allegation that Defendants misrepresented Anatabloc as a "wonder drug" is sufficient, Plaintiff's express warranty claim still fails because, as noted earlier, it does not link particular statements to any individual Defendant. In *Ibarolla v. Nutrex Research, Inc.*, No. 12-cv-4848, 2012 WL 5381236, (N.D. Ill. Oct. 31, 2012), a similar case involving alleged statements made by two defendants—the manufacturer and a seller of certain nutritional supplements—the plaintiff alleged that "defendants" made certain promises or representations about the effectiveness of the products. But the plaintiff did not tether specific statements to a specific defendant in her complaint. *Id.* at *7. The court dismissed the complaint for this reason, concluding that the plaintiff had impermissibly treated different defendants as "identical" when "there [was] no basis for presuming that they made identical representations to [p]laintiff." *Id.* To cure the defect, the court concluded that the plaintiff "must identify what representations were made by each [d]efendant, so we can

determine whether they amount to express warranties." *Id.* The same reasoning applies here. Plaintiff cannot lump all Defendants together but must identify *specific* representations made by *specific* Defendants to state express warranty claims against particular Defendants.

The court also notes that under Illinois law, Plaintiff must prove privity of contract before he can recover economic damages for breaches of express and implied warranty claims. *See Northern Ins. Co. of N.Y.*, 2010 WL 2574225, at *2–3. Privity means that a plaintiff can only recover against his "immediate seller." *See Ibarolla*, 2012 WL 5381236 at *8. Plaintiff does not allege that he entered into a contract Star Scientific, or that he purchased Anatabloc from Star Scientific. While there might be an exception to the privity requirement (at least for express warranty claims) if a manufacturer expressly warrants its goods to the ultimate consumer, *see In re McDonald's French Fries Litig.*, 503 F. Supp. 2d at 957, Plaintiff's complaint does not allege such facts. If Plaintiff chooses to amend his complaint, he must establish privity of contract between himself and Star Scientific, or alternatively, must plead facts that demonstrate why he is exempt from proving privity of contract, before he can proceed on his warranty claims against Star Scientific.

## IV.     Breach of Implied Warranty (Count III)

To state a claim for breach of the implied warranty of merchantability, a plaintiff must allege that "(1) the defendant sold goods that were not merchantable at the time of sale; (2) the plaintiff suffered damages as a result of the defective goods; and (3) the plaintiff gave the defendant notice of the defect." *Indus. Hard Chrome, Ltd.*, 64 F. Supp. 2d at 748 (citing 810 ILCS 5/2–314). "To be merchantable, the goods must be, among other things, fit for the ordinary purpose for which the goods are used." 810 ILCS 5/2–314.[5]

---

[5]         The complaint did not specify whether Plaintiff intended to bring a claim for breach of implied warranty of fitness for a particular purpose, a breach of the implied warranty of merchantability, or both. In his response to Defendants' motion to dismiss, Plaintiff states that he did not intend to bring a claim for breach of implied warranty of fitness for particular purpose claim. (*See* Pl.'s Resp. at 20 n.93). Therefore, the court only considers whether the complaint

In Count III, Plaintiff alleges that "Defendants" sold Anatabloc and "knew of the use(s) for which Anatabloc was intended, and impliedly warranted the product to be of merchantable quality." (Compl. ¶¶ 93–94.) Plaintiff alleges that "Defendants breached the implied warranties, as Anatabloc was not fit for its intended purposes and uses as it could not deliver on the intended purposes and was not approved for such uses by the FDA." (Compl. ¶ 99.) Plaintiff asserts that "within a reasonable time" after he "knew or should have known" of Defendants' "breach of implied warranties," Plaintiff "placed Defendants on notice" of the defect. (*Id.* ¶ 102.) Plaintiff asserts he suffered damages as a result of Defendants' breach. (*Id.* ¶ 103.)

Here again, Plaintiff has failed to set forth facts sufficient to state a general claim for breach of the implied warranty of merchantability. First, Plaintiff has not alleged what the ordinary purpose of Anatabloc is or why Anatabloc was unfit for its ordinary purpose. Plaintiff pleads that "Defendants manufacture, market, and/or sell Anatabloc [and] promote Anatabloc as a 'wonder drug' with a number of medical benefits and uses[.]" (Compl. ¶ 1.) Plaintiff contends that because the drug "did not work" (*id.* ¶ 9), that is, it did not "provid[e] health benefits" (Pl.'s Resp. at 25), the drug was unfit for its ordinary purpose. Even on a motion to dismiss, however, Plaintiff's mere conclusion is not presumed true. *Iqbal*, 556 U.S. at 678. Specifically, Plaintiff does not allege in what way the product was ineffective. In this regard, the court notes again that Plaintiff has not disclosed his own reasons for purchasing Anatabloc—whether he has a traumatic brain injury, for instance—which might provide factual fodder for his bald assertion that the drug "did not work." Second, Plaintiff fails to adequately plead that he gave any Defendant notice that the drug did not work as intended, a necessary element of a breach of the implied warranty of merchantability claim. Plaintiff cannot simply allege that he provided notice; again, this is a legal conclusion that the court does not credit for the purposes of resolving a

sets forth facts sufficient to state a claim under the theory of the implied warranty of merchantability.

motion to dismiss. *Id.* Defendants' motion to dismiss Plaintiff's breach of implied warranty claim (Count III) is granted without prejudice.

## V. Unjust Enrichment (Count IV)

As an initial matter, the court notes that Plaintiff has failed to plead what law applies to his unjust enrichment claim. (*See* Compl. ¶¶ 104–110.) The court assumes Illinois law applies, because Illinois is where Plaintiff alleges he suffered an injury. To prevail on an unjust enrichment claim under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E. 2d 672, 679 (Ill. 1989). Because Plaintiff's claims "sound in fraud and are premised on the same core of allegations as [Plaintiff's] consumer fraud claims, the particularity requirements of Rule 9(b) apply." *Bettua v. Sears, Roebuck and Co.*, No. 08-cv-1832, 2009 WL 230573, at *5 (N.D. Ill. Jan. 30, 2009).

Plaintiff alleges that "Defendants have benefitted from their unlawful acts by receiving payments for the sales of Anatabloc. Defendants knew that Anatabloc could not treat or cure diseases—but advertised that it did." (Compl. ¶ 106.) Plaintiff asserts that he "conferred non-gratuitous benefits upon Defendants by paying for Anatabloc" (*id.* ¶ 107), that "Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiff . . . with full knowledge that, as a result of Defendants' unconscionable wrongdoing, Plaintiff [was] not receiving products of the high quality, nature, fitness, or value as reasonable consumers expected" (*id.* ¶ 109), and that allowing Defendants to keep Plaintiff's money would be "unjust and inequitable." (*Id.*)

In this case, "where the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent *claim* of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well." *Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) (discussing *Athey Prods.*

*Corp. v. Harris Bank Roselle*, 89 F.3d 430, 436 (7th Cir. 1996)).  Thus, because the court has concluded that Plaintiff has failed to adequately plead his ICFA claim under Rule 9(b), Plaintiff's unjust enrichment claim necessarily fails.  The court dismisses Plaintiff's unjust enrichment claim (Count IV) against all Defendants.

## CONCLUSION

The court grants Defendants' Rule 12(b)(6) motion to dismiss [25] all Plaintiff's individual claims because they fail to satisfy federal pleading standards.  The court dismisses these claims without prejudice.  Because Plaintiff has not alleged a claim under Illinois law, the court declines to rule on Defendants' challenge to Plaintiff's ability to assert claims under the laws of other states.  Plaintiff has leave to file an amended complaint, if any, within 28 days.

ENTER:

Dated:  January 13, 2015

REBECCA R. PALLMEYER
United States District Judge