**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **HOWARD T. BALDWIN and JERRY VAN NORMAN, individually and on behalf of all others similarly situated,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **No. 14 C 588** |
| **STAR SCIENTIFIC, INC., ROCK CREEK PHARMACEUTICALS, INC., and GNC HOLDINGS, INC.,** | ) ) ) ) | **Judge Rebecca R. Pallmeyer** |
| **Defendants.** | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Howard Baldwin and Jerry Van Norman bring this putative class action against Defendants Star Scientific, Inc. ("Star Scientific"), Rock Creek Pharmaceuticals, Inc. ("Rock Creek"), and GNC Holdings, Inc. ("GNC"). The crux of Plaintiffs' Amended Class Action Complaint is that Anatabloc, a pharmaceutical product manufactured by Star Scientific's subsidiary Rock Creek and sold at GNC stores, is not the "wonder drug" Defendants have advertised it to be. Specifically, Plaintiffs allege the advertising and marketing of Anatabloc was deceptive in that it claimed the product would provide "anti-inflammatory support" and other medical benefits, even though Defendants knew it could not provide those benefits. Plaintiffs bring this suit under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS § 505/1, *et seq.* and the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.10, *et. seq.* They also bring claims for breach of express and implied warranty of merchantability under Illinois and Missouri law, and a common law claim of unjust enrichment. Plaintiffs seek to represent a class composed of all individuals who purchased Anatabloc in Illinois and Missouri between August 1, 2011 and the present. Defendants now move to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the

following reasons, Defendants' motion is granted, but the dismissal is without prejudice for Counts I, II and VI.

The court has jurisdiction pursuant to 28 U.S.C. § 1331 and the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).[1]

## BACKGROUND

### I. Procedural History

Plaintiff Howard Baldwin initially filed this lawsuit on January 27, 2014, against Defendants Star Scientific, Rock Creek, and GNC on behalf of himself and a nationwide class of all individuals who purchased Anatabloc since it was first made available to consumers. (Class Action Compl. ("Compl.") [1] ¶¶ 18, 57.)  In his Complaint, Baldwin alleged that he had purchased Anatabloc at a GNC store in Yorktown, Illinois, and from Rock Creek through an online subscription service, which he subsequently cancelled because the product "did not work." (*Id.* ¶ 9.)  According to Baldwin, he purchased Anatabloc because of Defendants' representations that the product was a "wonder drug" with "a variety of medical benefits and uses, ranging from inhibiting inflammation to treating a number of ailments, including Alzheimer's disease, traumatic brain injury, ulcers, diabetes, and multiple sclerosis." (*Id* ¶ 15.) Baldwin did not identify which of these conditions, if any, he suffers from, but he alleges that Anatabloc could not "in fact, treat those diseases." (*Id.* ¶ 19.)  In addition, Baldwin alleged that

---

[1]  Plaintiffs have adequately pleaded facts sufficient to establish subject matter jurisdiction under CAFA.  CAFA grants federal jurisdiction over class actions in which at least $5,000,000 is in controversy, minimal diversity exists between the parties, and the total number of members of the class is greater than 100.  28 U.S.C. § 1322(d).  The approximate average amount of damages alleged by each Plaintiff is in excess of $100.  They would thus need a class of at least 50,000 individuals in order to satisfy the $5,000,000 requirement.  While Plaintiffs do not specify the class size, "it [would not be] legally impossible for plaintiffs to recover that much." *ABM Sec. Services, Inc. v. Davis*, 646 F.3d 475, 478 (7th Cir. 2011).  In any event, as noted in this court's previous order, there is complete diversity.  (*See* Mem. Opinion and Order, January 13, 2015 [44], at 14.)  Plaintiffs are citizens of Illinois and Missouri, whereas Defendants are citizens of Delaware, Florida, Pennsylvania, and Virginia. (Am. Compl. ¶¶ 7, 23–25.)  The $75,000 diversity jurisdiction threshold also appears to be satisfied. (*See* Mem. Op. at 14.)

Star Scientific engaged in deceptive tactics to promote Anatabloc, including falsely claiming that Johns Hopkins University was involved in clinical testing of the product and bestowing gifts upon Virginia's former governor and his spouse in exchange for their endorsement of Anatabloc. (*Id.* ¶¶ 30–34, 38.) Rock Creek, meanwhile, allegedly paid a research institute to study Anatabloc's effects, and GNC "pushed Anatabloc . . . without any evidence that Anatabloc could in fact provide" the benefits of which Star Scientific and GNC boasted. (*Id.* ¶¶ 23, 27.) Baldwin claimed that Defendants' fraudulent activities violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), breached express and implied warranties of merchantability, and resulted in unjust enrichment. (*Id.* ¶ 60.)

On January 13, 2015, this court dismissed Baldwin's Complaint without prejudice in a written Memorandum Opinion and Order. (*See* Mem. Opinion and Order, January 13, 2015 [44] at 2.) Regarding Baldwin's claims under the ICFA,[2] the court found that Baldwin had not pleaded fraud with particularity as required by Federal Rule of Civil Procedure 9(b) because he had not identified the content of the misrepresentations communicated to him by Defendants, nor had he specified when or where he saw Defendants' alleged misrepresentations or that the misrepresentations induced him to buy the product. (*See id.* at 17 ("To satisfy Rule 9(b), Plaintiff must identify a specific misrepresentation that he saw, the date he saw it, and where he saw it.").) Baldwin's Complaint, moreover, did not plead with particularity how Defendants' alleged misrepresentations were false; while Baldwin alleged that Anatabloc was ineffective because it could not treat or cure particular illnesses, he "fail[ed] to produce a single allegation that attribute[d] to a particular Defendant a statement about Anatabloc's alleged effectiveness." (*Id.* at 18–19.)

---

[2] Baldwin also brought claims under consumer protection statutes in 35 other states and the District of Columbia. (Compl. ¶ 76.) Because the court determined that Baldwin failed to state a claim under Illinois law, it did not decide the issue of whether he had standing to proceed under other state statutes. (Mem. Op. and Order at 13.)

While recognizing that Baldwin's express warranty claim did not need to meet Rule 9(b)'s heighted pleading standard, the court nonetheless found that this, too, failed to state a claim, noting that an allegation could "be so sketchy or implausible" that it fails to provide defendants with notice of a plaintiff's claim. (*Id.* at 21 (*quoting Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).) With regards to the express warranty claims against Star Scientific, Baldwin's Complaint failed to allege that he had entered into a contract with Star Scientific, or that an exception to the privity requirement applied to his case. (*Id.* at 22.) Baldwin's implied warranty claims also failed for several reasons, including that Baldwin did not say how Anatabloc "did not work" and "did not adequately plead that [Baldwin] gave any Defendant notice that the product did not work as intended, a necessary element of a breach of the implied warranty of merchantability claim." (*Id.* at 23.) Finally, because Baldwin had not alleged that he suffered an injury outside of Illinois, the court advised him that "[s]hould he attempt to file an amended complaint . . . named representatives [should] include persons who have allegedly suffered injury under the laws of at least some, if not all, of the other states whose laws Plaintiff invokes." (*Id.* at 13.)

On February 10, 2015, Baldwin, along with Missouri citizen Jerry Van Norman, filed an Amended Complaint "to respond directly to the Court's January 13, 2015 opinion." (Pl.'s Resp. to Defs.' Mot. to Dismiss [60] ("Pl.'s Resp.") at 1; Am. Class Action Compl. [45] ("Am. Compl.").) Plaintiffs allege violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.* (Count I), and the Missouri Merchandising Practices Act, MO. REV. STAT. § 407.010, *et. seq.* (Count II); breach of express warranties under 810 ILCS § 5/2-313 and MO. REV. STAT. § 400.2-313 (Counts III and IV); breach of the implied warranty of merchantability under 810 ILCS § 5/2-314 and MO. REV. STAT. § 400.2-314 (Counts V and VI); and unjust enrichment (Count VII). The Amended Complaint re-alleges many facts from Baldwin's initial Complaint, which were summarized by the court in its previous order. (*See* Mem. Op. and Order at 2–6.) The Amended Complaint contains additional allegations set forth

below. The court also restates facts in its previous order to the extent they are central to Plaintiffs' claims.

## II. Facts

Defendant Star Scientific launched Anatabloc in August 2011, billing it as a "miracle" supplement, with a variety of medical benefits and uses, ranging from inhibiting inflammation to treating a number of ailments, including Alzheimer's disease, traumatic brain injury, ulcers, diabetes, and multiple sclerosis." (*Id.* ¶ 28.) Anatabloc contains vitamins A and D3 and anatabine, an alkaloid found in the tobacco plant. (*Id.*) According to its label, Anatabloc provides "Anti-Inflammatory Support." (*Id.* ¶ 30.)

Prior to launching Anatabloc, Rock Creek entered into a research and royalty agreement with an affiliate of the Roskamp Institute to conduct preclinical and clinical trials on the product. (*Id.* ¶ 45.) Although Star Scientific did not disclose data supporting the results of these trials, the company reported that the results were "positive." (*Id.*) In one study, Roskamp tested the effects of Anatabloc on individuals with inflammation. (*Id.* ¶ 46.) Roskamp first reported that 26% of the subjects experienced a positive effect, and two days later claimed that the number was 61%. (*Id.*) Defendants Star Scientific and Rock Creek also hired two Johns Hopkins University doctors—Drs. Ladenson and Caturegli—as consultants to study Anatabloc and its active ingredient anatabine. (*Id.* ¶ 57.) In a 2011 study, the doctors looked at the effect of anatabine on mice with thyroiditis, a disease involving inflammation of the thyroid gland, and claimed to find that anatabine lowered the incidence and severity of the disease. (*Id.* ¶¶ 58, 61.) In 2012, the doctors conducted a similar study on humans with thyroiditis, which reportedly showed that Anatabloc lessened inflammation in these patients. (*Id.* ¶ 70.) According to Plaintiffs, Star Scientific and Drs. Ladenson and Caturegli used their affiliation with John Hopkins to give the false impression that the university was officially involved in the testing of Anatabloc. (*Id.* ¶ 63.) A January 2013 article published by *The Street*, however, revealed that

Johns Hopkins had no official involvement in Anatabloc, and that Drs. Ladenson and Caturegli were doing their research on their own time.  (*Id.* ¶ 71.)

In addition to paying for clinical studies, Star Scientific and Rock Creek entered into an endorsement agreement with Fred Couples, a famous professional golfer who suffers from arthritis, to promote Anatabloc.  (*Id.* ¶ 36.)  As part of this agreement, Fred Couples appeared in posters advertising Anatabloc, which were displayed at GNC stores, and nationally-aired television commercials.  (*Id.* ¶¶ 36–37.)  One television commercial, which last aired in October 2013, included the following dialogue:

COUPLES:   Thanks to Anatabloc, I'm thinking about trying some new things. . . . Uh, maybe I'll just stick to golf.

ANNOUNCER:   No matter what your activity, Anatabloc can help.   It's scientifically proven to help regulate excessive inflammation in joints and muscles.  It works, so you can play.

COUPLES:   I haven't felt this good in years!

ANNOUNCER:  Turn back the clock, with Anatabloc.

 (*Id.* ¶ 37.)  In another commercial, which last aired on December 30, 2013, the dialogue was as follows:

ANNOUNCER:   Are you suffering from joint pain, back pain, muscle pain, even arthritis?

JIMMY ARIAS (Former Professional Tennis Player, Commentator):  My shoulder was bad.  I was falling apart.  I wasn't able to play tennis any longer.

ANNOUNCER:   Stop suffering and start living a new active life with the help of Anatabloc.

FRED COUPLES:  I haven't felt this good in years!

JOHN ISNER (Professional Tennis Player):  I simply do not feel as sore as I have in the past.

JIMMY ARIAS:  I started taking it, all of a sudden, I'm playing fantastic.

DR. RYAN LANIER (Chief Research Scientist):   Anatabloc is a breakthrough supplement that is scientifically proven to manage excessive inflammation that can contribute to many types of pain.

NICK BOLLETTIERI (Famous Tennis Coach):  It can bring a lot of joy to people, take away the aches and pains.

LANIER:  The formula is so effective, that many people begin to see results in just a few days to a few weeks.

ARIAS:  I'm playing four hours a day.  I used to not be able to play more than once or twice a week.

BOLLETTIERI:  I take it.  My flexibility is tremendous.

ISNER:  Anatabloc will help prolong my tennis career.

COUPLES:  All I can say is it really works.

ARIAS:  Anatabloc's really done a great job for me.  It's changed my life.  I've got my physicality back.

COUPLES:  Turn back the clock, with Anatabloc.

ANNOUNCER:  Pick up your supply of Anatabloc today by visiting any GNC store nationwide.

(*Id.*)  Star Scientific also enlisted the help of former Virginia Governor Robert McDonnell and his wife to promote Anatabloc at conferences and other events.  (*Id.* ¶¶ 47–50.)  In exchange for their promotion of the product, Star Scientific's Chief Executive Officer provided the former governor and his wife with "luxury gifts and money."  (*Id.* ¶ 48.)  According to Plaintiffs, Star Scientific used its connections to the McDonnells to gain access to top state officials and give the product credibility.  (*Id.* ¶¶ 51–52.)

Plaintiffs Howard Baldwin, a citizen of Illinois, and Jerry Van Norman, a citizen of Missouri, both purchased Anatabloc in reliance on Defendants' representations regarding the product.  (Am. Compl. ¶¶ 9, 21–22.)  Baldwin suffers from arthritis and arthritis-like symptoms in his knees and hips, including inflammation and pain.  (*Id.* ¶ 10.)  He first learned about Anatabloc "from Star Scientific's representations to encourage investors to buy shares in its company."  (*Id.* ¶ 11.)  Baldwin has a subscription to an online financial publication called Agora Financial, which began "touting Star Scientific's representations as early as May 2011."  (*Id.*)  Among these representations was a statement that researchers at an unnamed famous Florida

Institute and John Hopkins University were "floored" by Star Scientific's potential resulting from a "life-saving treatment" called anatabine, which could fight inflammation, a problem behind rheumatoid arthritis and many other diseases. (*Id.*) Interested in investing in Star Scientific, "Baldwin continued to follow Star Scientific's statements directed to investors regarding Anatabloc's 'anti-inflammatory support'" and visited the company's website, which marketed the product. (*Id.* ¶ 12.)

Baldwin also purchased Anatabloc to treat his arthritis-like symptoms. (*Id.* ¶ 10.) On August 15, 2012, Baldwin visited a GNC store in Lombard, Illinois, looking for a supplement to reduce inflammation and pain in his joints. (*Id.* ¶ 13.) He saw posters in the store window that pictured Fred Couples and advertised Anatabloc "for the reduction of inflammation in joints and pain." (*Id.* ¶ 14.) When Baldwin told a GNC store employee what type of product he was looking for, the employee recommended Anatabloc and showed him the product. (*Id.*) The label represented that Anatabloc was for "anti-inflammatory support." (*Id.*) Because the store advertisements and employee recommendation were consistent with Star Scientific's investor statements and marketing materials, Baldwin purchased one bottle of Anatabloc from GNC for $96.39. (*Id.* ¶¶ 14–15.)

From January 2013 to August 2013, Baldwin also signed up for an online subscription of Anatabloc from Rock Creek, through which he received a bottle of Anatabloc for $79.99 each month. (*Id.* ¶ 16.) Throughout this period, Baldwin saw television commercials for Anatabloc featuring Fred Couples. (*Id.* ¶ 17.) He also continued to read "Star Scientific's investor statements discussing Anatabloc's success in treating inflammation." (*Id.*) In August 2013, when Baldwin "determined that Anatabloc was not providing the relief that Defendants had promised," he cancelled his subscription and stopped taking Anatabloc. (*Id.* ¶ 18.)

Similar to Baldwin, Van Norman suffers from arthritis, as well as back and knee problems. (*Id.* ¶ 20.) In January 2013, Van Norman saw "one or more" Fred Couples television commercials for Anatabloc. (*Id.* ¶ 21.) Around the same time, he also saw other

"representations that Anatabloc would provide anti-inflammatory support." (*Id.*) Based on these representations, on three different occasions in February 2013, Van Norman visited Rock Creek's website and purchased Anatabloc to help treat his symptoms. (*Id.* ¶ 22.) Van Norman then visited Star Scientific's website, saw its representations regarding the product, and signed up for an online subscription of Anatabloc from Rock Creek. (*Id.*) After receiving a trial bottle for $4.95, Van Norman paid $79.99 each month for one bottle of Anatabloc. (*Id.*) On an unstated date, "after it became clear to him that Anatabloc did not provide the relief promised," Van Norman cancelled his subscription. (*Id.*)

On December 13, 2013, the FDA sent a letter to Star Scientific, warning that the "therapeutic claims on [Star Scientific's] websites establish that [Anatabloc] is a drug because it is intended for use in the cure, mitigation, treatment, or prevention of disease." (*Id.* ¶ 76.) The FDA further stated that, because Anatabloc is considered to be a new drug, it must obtain approval from the FDA before it can be marketed in the United States. (*Id.* ¶ 77.) In response, Star Scientific and Rock Creek submitted a New Dietary Ingredient Notification ("NDIN") with the FDA in an attempt to legally market Anatabloc as a dietary supplement (as opposed to a drug). (*Id.*) The FDA rejected the NDIN, explaining that the FDA considers anatabine, the principal ingredient in Anatabloc, to be a drug, not a dietary supplement, because anatabine "is intended to provide anti-inflammatory support, and was the subject of a previously-filed Investigational New Drug Application." (*Id.* ¶ 79.)

In response to the FDA's position regarding anatabine, Star Scientific and Rock Creek decided to "permanently exit[ ] the dietary supplement business in the U.S." (*Id.* ¶ 81.) As of September 12, 2014, Star Scientific and Rock Creek permanently suspended sales of Anatabloc in the United States. (*Id.* ¶ 80.) Star Scientific and Rock Creek have also found themselves at the center of both criminal and civil legal proceedings relating to the marketing and sale of Anatabloc. Following a criminal trial in September 2014, Governor McDonnell and his wife were found guilty of accepting money and bribes from Star Scientific's CEO in

exchange for endorsing the product. (*Id.* ¶ 55.) McDonnell was sentenced to twenty-four months in prison. (*Id.* ¶ 56.) Star Scientific was also the target of two lawsuits brought by the company's shareholders in federal and state court, alleging violations of securities laws and breaches of fiduciary duties for, among other things, Star Scientific's "scheme to falsely promote Johns Hopkins as being involved in studying Anatabloc." (*Id.* ¶ 82–84.) Both lawsuits resulted in settlement. (*Id.* ¶ 87.)

Plaintiffs allege that Defendants' representations regarding Anatabloc were deceptive and misleading because they advertised Anatabloc as a product that could treat inflammation and cure a variety of diseases, even though Anatabloc "could not and did not provide inflammatory support, or treat [those diseases]." (*Id.* ¶ 6; *see also id.* ¶ 34.) Plaintiffs further allege that "Defendants *knew* Anatabloc could not treat or cure diseases or provide anti-inflammatory support." (*Id.* ¶ 178 (emphasis added).) To redress their alleged injuries, Plaintiffs seek damages as well as equitable and declaratory relief. (*Id.* at 50.)

## DISCUSSION

In their motion to dismiss, Defendants have levied a broad range of attacks against Plaintiffs' Amended Complaint. First, Defendants argue that Plaintiffs' fraud claims under the ICFA and MMPA do not meet the particularity requirements under Federal Rule of Civil Procedure 9(b) and, more fundamentally, fail to plausibly allege that Defendants' representations were false. Second, Defendants argue that Plaintiffs' breach of warranty claims do not allege the existence of any express warranty or that a breach of warranty was communicated to Plaintiffs. Plaintiffs' breach of warranty claims also fail, according to Defendants, because Plaintiffs did not provide Defendants with sufficient notice of the alleged breach. Finally, Defendants argue that Plaintiffs' unjust enrichment claim necessarily fails because it is predicated on the same allegations that form the basis of their other claims. The court addresses each of Defendants' arguments in turn.

Before doing so, however, it is necessary to address the scope of Plaintiffs' claims. A substantial portion of Plaintiffs' Amended Complaint discusses alleged representations made by Defendants regarding Anatabloc's ability to treat or cure various diseases. (*See, e.g.*, Am. Compl. ¶ 1 ("Defendants promoted Anatabloc as a 'wonder drug' with a number of medical benefits, from treating . . . Alzheimer's disease, [to] traumatic brain injury (or concussions), diabetes and multiple sclerosis"); *id.* ¶ 129 ("[Defendants] expressly warranted that Anatabloc could treat or cure a variety of ailments and diseases"); *id.* ¶ 130 ("[Anatabloc] cannot treat or cure the variety or ailments or diseases touted by [Defendants]").) The Amended Complaint also focuses on the allegedly false and misleading impression conveyed by Star Scientific that Johns Hopkins University was involved in studies of Anatabloc. (*See, e.g., id.* ¶¶ 5, 11, 59–61, 63–69, 71.) Plaintiffs, however, do not allege that they ever viewed or relied on specific representations by Defendants that Anatabloc could cure or treat particular diseases. Rather, both Plaintiffs allege that they purchased Anatabloc because of Defendants' statements that it would provide "anti-inflammatory support," which caused Plaintiffs to believe that the product would help alleviate their arthritis-like symptoms by reducing inflammation. (*See id.* ¶¶ 10, 20–21.) Nor do Plaintiffs allege that they viewed or relied on Defendants' statements about John Hopkins' involvement in carrying out studies of Anatabloc. Plaintiffs only have standing to bring claims related to their alleged injuries. *See Lujan v. Defenders of Wildlife*, 505 U.S. 555, 559–61 (1992) (holding that in order to have standing, plaintiffs must show a "causal connection between the injury and the conduct complained of"); *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 500 (7th Cir. 2005) ("The causation element of standing demands that the injury be 'fairly . . . trace[able] to the challenged action of the defendant[.]'") (internal citation omitted). The only allegations relevant to the court's analysis, therefore, are those involving Anatabloc's effectiveness at treating inflammation or providing "anti-inflammatory support."

## I. Legal Standard

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007)). When deciding a Rule 12(b)(6) motion, the court must accept the facts pleaded in the complaint as true, and construe them in the light most favorable to the plaintiff. *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015). The court is not required, however, to accept a "legal conclusion couched as a factual allegation," nor is the court required to accept allegations that "amount to nothing more than a formulaic recitation of the elements" of a claim. *Iqbal*, 556 U.S. at 681, 129 S. Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955) (internal quotations omitted). After accepting all non-conclusory allegations as true and drawing all reasonable inferences in favor of the plaintiff, the court must determine whether the complaint alleges a plausible claim to relief. *Iqbal*, 556 U.S. at 679–80, 129 S. Ct. 1937. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## II. ICFA and MMPA Violations (Counts I and II)

In Counts I and II, Plaintiffs allege that Star Scientific and Rock Creek violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") and the Missouri Merchandising Practices Act ("MMPA"). (Am. Compl. ¶¶ 104–05, 117–18, citing 815 ILCS § 505/1, *et seq.*, and MO. REV. STAT. § 407.10, *et. seq.*) To state a claim under the ICFA, a plaintiff must allege (1) a deceptive or unfair act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) damages proximately caused by the deception. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012) (quoting *Siegel*

*v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010)). An MMPA claim requires plaintiff to allege that he (1) purchased a product from the defendant; (2) primarily for personal, family, or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act by the defendant declared unlawful by the MMPA, such as material deception, fraud, or misrepresentation in connection with the sale or advertisement of merchandise. *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 896–97 (8th Cir. 2014) (citing MO. REV. STAT. §§ 407.020.1, 407.025(1)).

Claims of fraud under the ICFA or MMPA must satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading standard, which requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreens Co.*, 631 F.3d 436, 441 (7th Cir. 2011) (ICFA); *Johnsen v. Honeywell Int'l Inc.*, No. 14-cv-594, 2015 WL 631361, at *9 (E.D. Mo. Feb. 12, 2015) (MMPA). Under Rule 9(b), a plaintiff must state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992). In order words, the plaintiff "must describe the 'who, what, when, where, and how' of the fraud." *Pirelli Armstrong Tire*, 631 F.3d at 441–42 (internal citations omitted). If plaintiffs do not "plead the specific date, place, or time of the fraudulent acts," they must "use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.* (quoting James W. Moore, MOORE'S FEDERAL PRACTICE § 9.03[1][b], at 9–18 (3d ed. 2010)). As noted above, Defendants contend that Plaintiffs' claims under the ICFA and MMPA should be dismissed because they do not satisfy Rule 9(b)'s heightened pleading requirements for fraud. (Defs. Mot. at 5.)

Although the Amended Complaint is an improvement upon Baldwin's initial Complaint, it suffers from some of the same deficiencies. First, many of the allegations in the Amended Complaint do not identify specific representations made by Defendants. (*See* Mem. Op. and

Order at 16–17 (stating that allegations that fail to identify "specific misrepresentations" are insufficient under Rule 9(b)).) The Amended Complaint states, for example, that Baldwin viewed Star Scientific's investor statements regarding Anatabloc's ability to treat inflammation. (Am. Compl. ¶¶ 12, 17.) It does not identify any specific investor statement, however, nor does it specify the content of these statements, or when or where Baldwin read them. *See Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago*, 927 F.2d 988, 993 (7th Cir. 1991) (holding that a plaintiff must allege "the *specific* content of [ ] fraudulent statements" in order to satisfy the requirements of Rule 9(b)) (emphasis original). The Amended Complaint also states that Baldwin visited Star Scientific's website marketing Anatabloc, but again, fails to state when he visited the website or describe its contents. (*See* Am. Compl. ¶ 12.) Similarly, the Amended Complaint alleges that Van Norman viewed "representations that Anatabloc would provide anti-inflammatory support," including statements appearing on Star Scientific's website, but no other specifics. (*Id.* ¶¶ 21–22); *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994) (holding that "identifi[cation of] the general nature of the purported misrepresentations," without more, does not comport with Rule 9(b)).

Plaintiffs' allegations relating to Defendants' television advertisements for Anatabloc provide a bit more detail: Plaintiffs allege that they viewed television commercials for Anatabloc featuring Fred Couples between January 2013 and August 2013, though they do not identify the particular content of these commercials. (*See id.* ¶ 21.) The Amended Complaint does provide details about two Fred Couples commercials for Anatabloc that last aired in October 2013 and December 2013, but it does not allege that these were the same commercials, or similar to those, viewed by Plaintiffs. (*Id.* ¶¶ 36–37.)

The Amended Complaint also alleges an incident in which Baldwin visited a GNC store in August 2012 looking for a supplement to alleviate his inflammation. Baldwin allegedly spoke with a GNC employee and "explained . . . what . . . he was looking for." (*Id.*) The employee, Plaintiffs allege, "recommended Anatabloc and showed Mr. Baldwin the product package." (*Id.*)

While Plaintiffs' remaining allegations at least identify specific statements communicated to Plaintiffs, they do not identify by whom or when the statements were made. The Amended Complaint alleges that Baldwin viewed a statement about Anatabloc via Agora Financial, a financial publication to which Baldwin subscribes. (Am. Compl. ¶ 11.) The statement provided that researchers were "floored" by Star Scientific's potential due to a "life-saving treatment" called anatabine, which could fight inflammation. (*Id.*) The court is uncertain whether these representations were made by Defendants, as opposed to Agora Financial or the researchers referred to in the statement, but assuming the statements were made by Star Scientific or Rock Creek, Plaintiffs have not specified when these statements were made or viewed by Baldwin. *Uni*Quality*, 974 F.2d at 923 (holding that Rule 9(b) requires plaintiff to state "the time, place, and content of the misrepresentation") (internal quotation omitted); *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 470 (7th Cir. 1999) (emphasizing the importance of complying with Rule 9(b)'s "when" requirement and citing cases to that effect). The Amended Complaint merely states that Agora Financial began "touting" Defendants' representations "as early as May 2011." (Am. Compl. ¶ 11.) Although this suggests that Baldwin could not have viewed the representations before May 2011, it does not shed any additional light on the approximate timeframe when he actually viewed them.

In just two instances, the Amended Complaint provides "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni*Quality*, 974 F.2d at 923. Plaintiffs allege that when Baldwin visited a GNC store on August 14, 2012, he saw posters featuring Fred Couples that "market[ed] Anatabloc for the reduction of inflammation in joints and pain." (Am. Compl. ¶ 14.) During the same visit, he also viewed the Anatabloc package and label, which stated that the product was for "anti-inflammatory support." (*Id.*) Contrary to these claims, Plaintiffs allege that Anatabloc "could not and did not provide anti-inflammatory support," did not "provid[e] the relief promised," and generally "did not work." (Am.

15

Compl. ¶¶ 9, 18, 22.)  As this court explained in its previous order, however, Plaintiffs' "mere conclusion [that the drug 'did not work'] is not presumed true."  (Mem. Op. and Order at 23.)  To the extent Plaintiffs' fraud claim is based on their personal experiences taking Anatabloc, they need to say far more than Anatabloc "did not work" or "failed to "provid[e] the relief promised." Otherwise, the court is unable to draw the reasonable inference that "Defendants *knew* that Anatabloc could not . . . provide anti-inflammatory support," and thus committed fraud by advertising that it could.  (*Id.* ¶ 178 (emphasis added).)

In their response to Defendants' motion to dismiss, Plaintiffs argue that their personal experiences taking Anatabloc "are [ ] supported by statements from the FDA that no products are available to treat conditions without a cure like arthritis (a conditions both Plaintiffs suffer from and expected Anatabloc to have an effect on.)"  (Pls. Resp. at 16.)  As mentioned above, however, Plaintiffs do not allege that they viewed or relied on statements that Anatabloc could "cure" or "treat" any particular disease.  Rather, the only representations allegedly viewed and relied on by Plaintiffs relate to Anatabloc's effectiveness at reducing inflammation and providing "anti-inflammatory support."  Reports by the FDA or any other regulatory authority would support Plaintiffs' claims if those reports stated that no products are available *to reduce inflammation.* The availability of well-known anti-inflammatory drugs, such as aspirin and ibuprofen, however, makes the existence of such reports unlikely.  For similar reasons, the alleged bribery of former Governor McDonnell by Star Scientific and Defendants' misleading statements about its relationship with Johns Hopkins do not support Plaintiffs' fraud allegations, as Plaintiffs have suggested no link between those misleading statements and Anatabloc's ability to treat inflammation.  (*Id.*)

To the extent Plaintiffs' fraud claim is purportedly based on scientific evidence, it also falls short.  Plaintiffs allege that Defendants' claims regarding Anatabloc were "never proven . . . in clinical trials."  (Am. Compl. ¶ 2.)  The Amended Complaint, however, identifies at least three different studies purporting to find that Anatabloc did have positive effects on inflammation.

(Am. Compl. ¶¶ 45, 57.)  Plaintiffs call these studies into question for the reason that they were performed by individuals either being paid by Star Scientific or with an interest in Star Scientific's success.  (*Id.*)  They allege that the Roskamp Institute received royalties from sales of Anatabloc in exchange for performing certain preclinical and clinical trials of the product, while Drs. Ladenson and Caturegli from John Hopkins University were hired as consultants by Star Scientific to study Anatabloc and its active ingredient anatabine.  (*Id.*)  The fact that these studies were paid for by Star Scientific, however, does not by itself make Defendants' results "false," as Plaintiffs argue.  (Pl.'s Resp. at 16.)  Even assuming the results were false (which is not supported by the alleged facts), Plaintiffs face an additional hurdle: they do not adequately allege that they ever viewed or relied on Defendants' statements regarding John Hopkins University's purported involvement in the Anatabloc studies.  The Amended Complaint alleges that Agora Financial, a financial publication to which Baldwin subscribes, began "touting" Star Scientific's representations in May 2011, including a statement that researchers at a "famous institute in Florida" and Johns Hopkins University were "absolutely floored" by the potential of anatabine to fight inflammation.  (Am. Compl. ¶ 11.)  As mentioned above, Plaintiffs do not state if and when Baldwin viewed this specific representation, and they do not state whether the representation was made by Defendants, as opposed to a third party.  Plaintiffs also allege that a television advertisement for Anatabloc represented that the product was "scientifically proven to help regulate excessive inflammation," but again, Plaintiffs fail to allege that they viewed this commercial.  (*Id.* ¶ 37.)

Where Plaintiffs do not allege that they relied on Defendants' misrepresentations regarding studies of Anatabloc, they must do more than cite allegedly unreliable research that tends to *support* Defendants' representations.  *See Bronson v. Johnson & Johnson, Inc.*, No. C 12-04184 CRB, 2013 WL 1629191, at *8 (N.D. Cal. Apr. 16, 2013) (holding that "reliance on a lack of scientific evidence or inconclusive, rather than contradictory, evidence is not sufficient to state a [fraud] claim").  In order to make a plausible allegation that Defendants' statements were

fraudulent, Plaintiffs must identify scientific studies or other evidence showing that Anatabloc was ineffective at treating inflammation. *See Padilla v. Costco Wholesale Corp.*, No. 11-c-7686, 2012 WL 2397012, at \*4 (N.D. Ill. June 21, 2012). In *Padilla*, the plaintiff brought an ICFA claim against Costco, challenging statements that appeared on the label of its dietary supplement Glucosamine. *Id.* at \*1. The court dismissed the complaint, in part, because the plaintiff alleged that "numerous clinical studies" and other "scientific evidence" showed the product did not help "joint renewal and rejuvenation," yet failed to identify any specific studies or evidence. *Id.* at \*4. The plaintiff also failed to allege that Costco represented that Glucosamine would provide "joint renewal and rejuvenation." *Id.* Accordingly, the court held that the plaintiff "fail[ed] to allege 'how' Costco's product labels were fraudulent." *Id.* Here, while Plaintiffs allege that Defendants represented that Anatabloc would provide "anti-inflammatory support," they do not allege that clinical studies or other scientific evidence showed otherwise. *See Murray v. Elations Company, LLC*, No. 13-cv-02357, 2014 WL 3849911, at \*1, 6–7 (S.D. Cal. Aug. 4, 2014) (granting motion to dismiss on the grounds that plaintiff failed to plausibly allege defendants' statements were fraudulent where studies cited by plaintiff did not have a direct bearing on defendants' claims that product would create "healthier joints" and improve "joint comfort" and flexibility). This is fatal to Plaintiff's claim.

For the reasons stated above, the court grants Defendants' motion to dismiss Plaintiffs' ICFA and MMPA claims.

### III.  Breach of Express and Implied Warranty Claims (Counts III, IV, V, VI)

Plaintiffs also bring claims for breach of express and implied warranties under the Uniform Commercial Code ("UCC") (810 ILCS § 5/2-313 and MO. REV. STAT. § 400.2-313)[3] premised on the same allegations—that Defendants falsely represented that Anatabloc could

---

[3]    *See* 810 ILCS § 5/1-101(a) ("This Act may be cited as the Uniform Commercial Code."); MO. REV. STAT. § 400.2-101 ("This articles shall be known and may be cited as 'Uniform Commercial Code—Sales."); *see also Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 589 (Ill. 1996) (Illinois . . . [has] primarily followed the majority interpretation of the UCC.")

provide "anti-inflammatory support." In order to recover under a claim for breach of express or implied warranty under Illinois or Missouri law, a plaintiff must establish that she provided defendant with notice of the alleged breach "within a reasonable time after she discover[ed] or should have discovered [it]." *See Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 491–92 (Ill. 1996) (citing 810 ILCS § 5/2-607(3)(a)); *Johnsen v. Honeywell Intern, Inc.*, No. 14-cv-594, 2015 WL 631361, at *5 (E.D. Mo. Feb. 12, 2015); *Cambridge Eng'g, Inc. v. Robertshaw Controls Co.*, 966 F. Supp. 1509, 1522 (E.D. Mo. 1997). There are two exceptions to the notice requirement. Direct notice is not required when: (1) the defendant had "actual knowledge" of the product's defect, or (2) where the plaintiff suffered personal injury. *Ibarrola v. Kind, LLC*, 83 F.Supp.3d 751, 760 (N.D. Ill. 2015) (citing *Connick*, 675 N.E.2d at 591).

The court agrees with Defendants that neither exception to the notice requirement applies in this case. (Defs. Reply Mem. in Support of Mot. to Dismiss ("Defs. Reply") at 10.) Plaintiffs do not allege physical injury; rather, they state that they suffered economic damages as a result of Defendants' misconduct. (Am. Compl. ¶¶ 109, 111, 122, 124.) Nor do Plaintiffs sufficiently allege that Defendants had actual knowledge of the breach of the warranty. In their response to Defendants' motion to dismiss, Plaintiffs argue that direct notice was not necessary because Defendants "sold Anatabloc by representing that it would provide 'anti-inflammatory support,' knowing that such representations were false, misleading, and untrue." (Pls. Resp. at 22.) As explained earlier, Plaintiffs fail to plausibly allege that Anatabloc could not provide anti-inflammatory support, much less that Defendants had "actual knowledge" that it could not do so.

The court also agrees with Defendants that Plaintiffs' failure to provide pre-litigation notice bars their breach of express and implied warranty claims. The initial Complaint alleged that Baldwin "placed Defendants on notice" of the product's defect "within a reasonable time" after he "knew or should have known" of Defendants' misconduct. (Compl. ¶¶ 102–03.) The court found that this assertion, without more, was insufficient to show that "he gave any Defendant notice that the drug did not work as intended, a necessary element of a breach of [ ]

warranty of merchantability claim." (Mem. Op. and Order at 23.) Plaintiffs subsequently attempted to cure this oversight by providing Defendants with notice "that Anatabloc did not work as warranted or intended" on February 10, 2015, the same day that they filed the Amended Complaint. (Am. Compl. ¶ 135; Defs. Mot. at 16.) Plaintiffs, therefore, no longer allege that they provided pre-litigation notice to Defendants. Instead, they argue that the mid-litigation notice they sent on February 10, 2015 was sufficient because "Defendants suffered no prejudice." (Pls. Resp. at 21.)

Yet Defendants may well have suffered prejudice by Plaintiffs' failure to give pre-suit notice. "The purpose of notice is 'to provide the seller with an opportunity to correct any defects, prepare for litigation, and prevent stale claims.'" *Osgood v. Worm World, Inc.*, 959 S.W.2d 139, 414 (Mo. 1998) (quoting *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 369 (Mo. 1993)); *see also Ragland Mills, Inc. v. General Motors Corp.*, 763 S.W.2d 357, 361 (Mo. App. Ct. 1989) ("One of the important purposes of the notice requirement is to afford the seller an opportunity to arm itself for negotiation and litigation.") "The drafters of the U.C.C. contemplated that, by adding a notice requirement, adverse parties would have knowledge of a pending claim and have an incentive to attempt settlement of breach of warranty claims prior to commencement of a suit." *Reyes v. McDonald's Corp.*, Nos. 06-cv-1604, 06-cv-2813, 2006 WL 3253579, at *3 (N.D. Ill. Nov. 8, 2006). Because Plaintiffs did not provide Defendants with notice of their breach of warranty claims before initiating the lawsuit, Defendants were deprived of the opportunity to prepare for potential litigation, and more importantly, the opportunity to avoid litigation altogether through settlement or other dispute resolution alternatives. This in itself is sufficient prejudice to support dismissing Plaintiffs' claims.

The court also rejects Plaintiffs' argument that the UCC's notice requirement can be satisfied *after* litigation has already begun. *See Anthony v. Country Life Manuf.*, LLC, 70 Fed. App'x 379, 384 (7th Cir. 2003) ("[Section 2-607(3)(a)] requires a plaintiff to notify the defendant of the claimed deficiency in its product prior to filing suit."). Allowing Plaintiffs to provide

Defendants with notice of a breach of warranty after Plaintiffs have filed the lawsuit would defeat a principal purpose of the notice requirement discussed above: to allow defendants to "arm [themselves]" for potential litigation or attempt settlement. *Ragland Mills*, 763 S.W.2d at 361; *Reyes*, 2006 WL 3253579, at *3. It is with this purpose in mind that courts have dismissed breach of warranty claims in similar cases where litigants failed to provide defendants with pre-suit notice. *See, e.g.*, *Reyes*, 2006 WL 3253579, at *3 (dismissing breach of warranty claim for failure to provide pre-suit notice, noting that plaintiffs "allow[ed] no time for settlement discussions between the parties"); *Ibarrola*, 83 F.Supp.3d at 761 (dismissing breach of warranty claim with prejudice for failure to provide pre-suit notice, emphasizing that "the purpose of the notice requirement is to provide an incentive for parties to resolve warranty disputes prior to filing suit"); *Microsoft Corp. v. Logical Choice Computers, Inc.*, No. 99-cv-1300, 2000 WL 1038143, at *4 (N.D. Ill. July 24, 2000) (dismissing complaint for failure to adequately plead pre-litigation notice, and stating that "notice is particularly important in infringement actions because . . . the seller [can] exercise its option to demand that the buyer turn control of the litigation, including settlement, to him"). Although there are no Missouri cases holding that pre-litigation notice is required under Missouri law, the court is satisfied that the purpose of the notice requirement is the same. The same reasoning, therefore, applies to Plaintiffs' breach of warranty claims under Missouri law.

Plaintiffs are correct that "'[w]hether sufficient notice has been provided is generally a question of fact to be determined based upon the particular circumstances of each case.'" (Pls. Resp. at 22 (quoting *Al Maha Trading & Contr. Holding Co. v. W.S. Darley & Co.*, 936 F.Supp.2d 933, 941 (N.D. Ill. 2013) (quoting *Maldonado v. Creative Woodworking Concepts, Inc.*, Ill. App. 3d 935, 939, 694 N.E.2d 1021 (3d Dist. 1998)).) "However, when no inference can be drawn from the evidence other than the notification was unreasonable, the question can be decided by the court as a matter of law." *Al Maha Trading*, 936 F.Supp.2d at 941 (quoting *Maldonado*, 694 N.E.2d at 1026). There is no question that Plaintiffs' notice was insufficient.

Baldwin's initial Complaint alleged that Defendants had been provided with notice, but Plaintiffs now have affectively conceded that they did not provide Defendants with notice until more than one year after commencing this lawsuit.  *See Maldonado*, 694 N.E.2d at 1026 ("In [providing notice to the [defendant], the plaintiff is held to a standard of good faith." (citing 810 ILCS Ann. § 5/2-607)); *see also* MO. REV. STAT. § 400.2-607, Note 5.

For the reasons outlined above, it would be impossible for Plaintiffs to cure their failure to provide pre-litigation notice by further amending their breach of express and implied warranty claims.  The court thus dismisses these claims with prejudice.

## IV.    Unjust Enrichment (Count VII)

Lastly, Plaintiffs bring a common law claim for unjust enrichment, alleging that "[a]llowing Defendants to retain the non-gratuitous benefits Plaintiffs and the Class members conferred [upon Defendants by paying for Anatabloc] would be unjust and inequitable under these circumstances."  (Am. Compl. ¶¶ 179, 181.)  Defendants argue that Plaintiffs' unjust enrichment claim fails because it "is predicated on the same allegations that form the basis of their other claims," which fall short of stating a claim upon which relief may be granted.  (Defs. Mot. at 3.)  The court agrees with Defendants.  As the court noted in its previous order, "'where the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dipositive of the unjust enrichment claim as well.'"  (Mem Op. and Order at 24–25 (quoting *Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) (discussing *Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 436 (7th Cir. 1996))).)  Because the unjust enrichment claim in the initial Complaint was predicated on the same allegations of fraudulent conduct under the ICFA, which Plaintiff had failed to adequately plead under Rule 9(b), the court held that "Plaintiff's unjust enrichment claim necessarily fail[ed]."  (*Id.* at 25.)

The court dismisses Plaintiffs' unjust enrichment claim in the Amended Complaint for the same reasons that the court dismissed the unjust enrichment claim in its previous order.

Plaintiffs' unjust enrichment claim "'sound[s] in fraud and [is] premised on the same core allegations as [Plaintiffs'] [ICFA and MMPA] fraud claims.'" (*See id.* at 24 (quoting *Bettua v. Sears, Roebuck Co.*, No. 08-cv-1832, 2009 WL 230573, at *5 (N.D. Ill. Jan. 30, 2009).) Accordingly, the court's resolution of Plaintiffs' ICFA and MMPA fraud claims are "'dispositive of the unjust enrichment claim as well.'" (*Id.* (quoting *Caremark RX*, 493 F.3d at 855).) Plaintiffs have failed to adequately plead that Defendants committed fraud under the ICFA or MMPA by advertising Anatabloc for "anti-inflammatory support." Absent any deception on the part of Defendants, Plaintiffs' claim for unjust enrichment must fail. *See Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 943 (7th Cir. 2001) ("[I]n the absence of any deception on the part of the defendants, the requisite [elements of unjust enrichment] are not present.")

## CONCLUSION

For the above stated reasons, Defendants' motion to dismiss is granted. The Amended Complaint is dismissed. Plaintiffs will have leave to file an amended complaint within 21 days with respect to those claims not dismissed with prejudice.

ENTER:

Dated: February 2, 2016

_____
REBECCA R. PALLMEYER
United States District Judge